[Civ. No. 18823. Fourth Dist., Div. One. Feb. 25, 1981.]

IRMA SANCHEZ, a Minor, et al., Plaintiffs and Appellants, v. BAY GENERAL HOSPITAL, Defendant and Appellant.

778

COUNSEL

Goebel & Monaghan, Brian D. Monaghan, Purvin, Hinton & Adkins and Paul D. Hinton for Plaintiffs and Appellants.

McCormick & Royce, Patrick A. McCormick, Jr., Horvitz & Greines, Ellis J. Horvitz and Alan G. Martin for Defendant and Appellant.

OPINION

**STANIFORTH, J.**—The jury awarded plaintiffs, the four surviving minor children of Socorro Sanchez (Sanchez), compensatory damages in the sum of $400,000 for her wrongful death resulting from the negligence of the nursing staff at the defendant Bay General Hospital (Hospital). At the close of evidence in a six-week trial, the Sanchez children moved for a directed verdict on the issue of liability. The trial court granted the motion based upon its conclusion that the doctrine of res ipsa loquitur was applicable as a matter of law. Hospital appeals contending that the basic conditions required for the application of the doctrine of res ipsa loquitur were not established as a matter of law. The minor children on the other hand contend that there was a total failure to rebut the clear presumption of negligence on the part of the

Hospital's nursing staff in caring for Sanchez after her operation and release to the recovery room. It is asserted the Hospital failed to produce any conflicting evidence that would warrant the giving of a conditional res ipsa loquitur instruction to the jury.

Following the jury verdict of the $400,000, a separate hearing was held on the question of the Hospital's entitlement to an offset of $45,000 paid by defendants Kriak and Morrell, owners and operators of the other car involved in the accident causing Sanchez' original injury in 1973. Defendants Kriak and Morrell were dismissed from this proceeding upon payment of the $45,000 in settlement.

## FACTS

As a result of minor injuries sustained in a 1973 automobile accident, Sanchez filed a personal injury action in the superior court against the defendants Kriak and Morrell, the owners and operators of the other automobile involved in the accident. As a result of the minor physical problems persisting after this accident, Sanchez was referred to Dr. Jeanes, who admitted her to the Hospital on February 24, 1975, for a diagnostic procedure, a cervical myelogram. Following the myelogram, an elective surgery (laminectomy) was suggested and Sanchez consented. The surgery was successfully performed. On the morning of the surgery, Dr. Norman Siderius placed an atrial catheter in Sanchez by inserting a plastic tube with a needle on the end into the vein of her left arm and advancing it up the vein until it entered the upper right midatrium of her heart. The purpose of the catheter was to drain off any air embolism that might develop. With the catheter in place, Sanchez was transferred to the recovery room at about 12:35 p.m. in satisfactory condition. In the recovery room, she vomited slightly, a common postoperative event. During the period 12:35 p.m. through 3 p.m., while Sanchez remained in the recovery room, she appeared to be recovering satisfactorily. Her vital signs were checked every 15 minutes and appeared stable. At the time her last vital signs were taken in the recovery room, blood pressure reflected a reading of approximately 120/80. She appeared comfortable and at 3 p.m. she was asleep. At 3:15 p.m. she was transferred to the postoperative ward where a series of complications arose in her condition. The atrial catheter was left in place and apparently used and regarded by the nursing staff as a peripheral "I.V." She departed the recovery room in apparent satisfactory condition but her vital signs were not taken at that time. At approximately 3:20 p.m., Sanchez arrived at the postoperative ward located on the second floor of

the Hospital. Again no vital signs were taken by the nursing staff at that time, no neurological examinations were conducted and no tests for responsiveness were taken. The medical chart from the recovery room was not examined and none of the nursing personnel on the postoperative ward were aware that Sanchez had an atrial catheter implanted which had entered her heart.

The nursing staff conducted no examination of Sanchez' pupils on her arrival in the postoperative ward nor did they order any suctioning equipment, though her medical chart, had it been reviewed, reflected Sanchez was vomiting while in the recovery room. At approximately 3:30 p.m., Sanchez' vital signs were taken by nurses aide Sandra Johnson. They reflected a substantial decrease in blood pressure, pulse and respiration rate (96/60, 80, 18). Sandra Johnson made no comparison of the vital signs taken at 3:30 p.m. with the recovery room vital signs, nor were vital signs taken at any increased interval thereafter. No check of medication was undertaken, no neurological examination was done, no test for responsiveness was done, no examination of the pupils was done, no suction equipment was ordered and the nursing staff remained still unaware of the existence of the atrial catheter in Sanchez' heart. No supervisory nurse or physician was contacted or notified of the deteriorating vital signs. Requests by friends for medication and assistance were ignored and no communication of Sanchez' condition was made to the oncoming nursing staff. For example, at 3:40 p.m. Eduardo Vasquez—a friend visiting Sanchez who was present from the time of her arrival in the postoperative ward—reported to the nursing station Sanchez was vomiting and in pain. He requested medication and water to revive her. The Hospital nursing staff member did not leave the nursing station to verify the report but informed Vasquez "everything has been taken care of" and *told him he could get Sanchez water.* The operating surgeons' order directed that no water be given. Again no doctor or supervisory nurse was contacted nor was Sanchez' chart consulted.

At approximately 3:45 p.m., nurses aide Delino took Sanchez' vital signs which reflected a further decrease in blood pressure, pulse and respiration rate (90/50, 68, 16). No comparison was made of these vital signs with either the vital signs taken at 3:30 p.m. or in the recovery room; no direction was made that the vital signs be taken at intervals of five minutes or less in view of deteriorating condition. No neurological examination or tests for responsiveness or examination of pupils were undertaken and no physician or supervisory nurses were contacted with

respect to Sanchez' decreasing life signs. Sanchez was vomiting so Delino reported this to her team leader, Nurse Marmito. Marmito then went to Sanchez' room and checked the vital signs and found they tallied with those taken by Delino.

At approximately 3:55 p.m. Sanchez' heart arrested. Just before the cardiac arrest she had continued the vomiting which had been occurring consistently since her arrival on the floor. In the midst of this vomiting episode, she jerked violently, her pupils dilated and she became cyanotic. Her pulse stopped and her visiting friend ran for assistance. Delino entered the room, saw Sanchez and ran out in panic. Delino did not check the airway nor blood pressure, pulse or respiration, nor did she perform a cardiopulmonary resuscitation (CPR). Nor did she signal the nursing staff from the room. Thereafter and in response to Delino's cries, Nurse Marmito entered the room and checked the pupils, pulse and blood pressure and she then also panicked and did nothing to assist Sanchez. Again the Sanchez' airway was not checked and no CPR was undertaken.

A few moments later the emergency room physician (Ochs) arrived and attempted to treat Sanchez. Dr. Ochs was not told that what appeared to be a peripheral I.V. was in fact an atrial catheter. As a result of this oversight, all medications ordered by Dr. Ochs were administered through the catheter directly into Sanchez' heart. By 5 p.m. Sanchez was "brain dead" and she was transferred to an intensive care unit in critical condition. She existed in a vegetative state until April 23, 1975, at which time she died.

Sanchez ultimately died after the following incidents occurred: The nursing staff failed to properly inflate and care for a balloon cushion on the cuff of the tracheostomy tube. The nurses note reflects "[n]o nursing personnel on floor will take responsibility for giving tube feeding due to inability to inflate trach cuff completely and knowingly." As a result of this failure, the cuff of the tracheostomy tube gradually worked its way through the posterior of the trachea, eroded part of the left anterior aspect of the thoracic vertebrae and eroded laterally on the right side of the innominate artery. When the innominate artery eroded, Sanchez bled to death. The foregoing facts are essentially uncontradicted—taken primarily from the testimony of witnesses presented on behalf of the Hospital.

DISCUSSION

I

The Hospital argues the trial court committed prejudicial error in directing a verdict on the issue of liability because (1) the basic conditions of res ipsa loquitur were not established as a matter of law, (2) there was substantial evidence showing defendant was not negligent and finally (3) no negligence upon the part of the defendant was a proximate cause of the injury.

■ A directed verdict on the issue of liability may be granted only when disregarding all question of credibility and all unfavorable evidence and construing the evidence most strongly against the moving party and giving the resisting party the benefit of all presumptions and rational inferences drawn from the evidence, it can be said as a matter of law there is still a total lack of evidence of sufficient substance to support a verdict in favor of the resisting party. (*Dailey* v. *Los Angeles Unified Sch. Dist.* (1970) 2 Cal.3d 741, 745 [87 Cal.Rptr. 376, 470 P.2d 360].)

In *Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 362 [124 Cal.Rptr. 193, 540 P.2d 33], an action was brought for wrongful death arising out of the crash of a private airplane. At page 359, the Supreme Court stated: ■ "It is settled law in this state that the 'doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the one responsible. [Citations.]' [Citation.] According to the classic and oft-repeated statement, there are three conditions for the application of the doctrine: '"(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff."' (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 . . . .) The existence of one or more of these conditions is usually a question of fact for the jury. [Citations.] In a proper case, however, they all may exist as a matter of law. [Citations.]"

In *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 446 [247 P.2d 344], the court stated the rule as follows: "In summary it appears . . . that, as a general rule, res ipsa loquitur applies where the

accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible."

■ As stated under the rules of *Newing* v. *Cheatham* and the earlier cases a plaintiff's first hurdle is to produce evidence, and uncontroverted evidence, that the accident must be of a kind which ordinarily does not occur in the absence of someone else's negligence. Pertinent to this first test under the *Ybarra-Newing* formulation is the uncontradicted testimony of operating surgeon Dr. Jeanes who testified that death was not a common incident of cervical laminectomy. Question: "Is it very rare?" Answer: "It should be nonexistent." He said further, "I think the important fact to me is that a grave event was going on and there was virtual paralysis in response to it. Nothing went on. There were people running back and forth, but nothing was done and nobody was informed until it was apparent that she had no pulse and no blood pressure, then Dr. Ochs came on the scene, then the RN came on the scene, and then people started calling people." Question: "What in your opinion caused the arrest?" Answer: "I think she was allowed to asphyxiate. *I think a simple, common, everyday occurrence that occurs in every hospital every day was allowed to develop into a disaster.*" (Italics added.) Dr. Jeanes concluded that the standard of care that Sanchez received in the critical situation "was below the standard of care anywhere. It has nothing to do with San Diego or the U.S. I think this is just a basic—basically in response to this crisis that essentially nothing was done until it was too late, then, finally, effective measures were undertaken." Question: "[D]id that conduct on the part of the nurse and nurse's aide violate basic nursing principles in your opinion?" Answer: "I would say yes."

And the testimony of nursing expert witness Cassi Fay dealt with the conduct of nurses and nurses aides. Her testimony reflected there was a total lack of adherence to basic nursing principles and the resulting complications led to this death. And expert nursing witness Susan Cummings answered affirmatively to the question "[Was] the decline in the condition of Socorro Sanchez from the time that she arrived from the recovery room until the time that Dr. Ochs arrived, the kind of decline, condition, which ordinarily does not occur in the absence of someone's negligence?" Answer: "Yes." This witness said that what was happening to Sanchez in the postoperative period—the vomiting, change of vital signs—was pretty common. "But the record does not indicate a complete assessment and observation of her, and that appro-

priate actions were taken during this period of time." This witness further pointed out the importance of the vital signs going up or down and appropriate action taken and observations continued.

Based upon the testimony of Jeanes, Fay, and Cummings, the first condition was clearly established. With regard to the second and third requirement for the application invoking of the res ipsa loquitur doctrine, we note the case of *Folk* v. *Kilk* (1975) 53 Cal.App.3d 176, 184 [126 Cal.Rptr. 172], where the court cited both the rules of *Ybarra* and *Zentz, supra*, and indicated "[i]n malpractice cases arising out of surgical procedures, satisfaction of the second and third elements of *Ybarra* rule are usually inherent in the situation because the patient is under the exclusive control of the doctors or hospital and in no condition to perform a voluntary action that might contribute to his injury." (*Id.*, at pp. 184-185.) Here Sanchez was under the exclusive control of the nursing staff of defendant. No doubt exists. There was no contributory neglect by Sanchez. The plaintiff by clear uncontroverted evidence established the basis for the trial court's application of the doctrine of res ipsa loquitur. In further support of the trial court's conclusion that the first condition for the invocation of the res ipsa loquitur was satisfied, we find in *Newing* v. *Cheatham, supra*, 15 Cal.3d 351, 361, the Supreme Court's observation: "As we previously noted, the first condition for invocation of the res ipsa doctrine is satisfied if under the facts of the case, *common experience indicates that the accident would not have occurred unless there had been negligence on the part of someone.*" (Italics added.) Such rule fits here.

The foregoing facts are not contradicted. The Hospital produced three witnesses, Dr. Roger Williams, Dr. Ochs and Mrs. Shirley Walters, none of whom responded to the damaging evidence of negligence causing Sanchez' death. None testified the accident would ordinarily have occurred in the absence of negligence on the part of someone. Defendant's counsel conceded no such evidence was placed before the court. Dr. Roger Williams, defendant's expert pathologist, focused his attention on the cause of Sanchez' brain death. He admitted insufficient knowledge to form an opinion as to whether the conduct of the nursing staff was negligent. Defendant's counsel acknowledged Dr. Williams' lack of expertise in this area. Dr. Williams was never asked the critical question whether this type of injury was one which does not ordinarily occur in the absence of someone's negligence. Mrs. Walters, the director of nursing at the Hospital, was called as a defense expert witness but was never asked the question as to whether this accident

was of the kind which ordinarily does not occur in the absence of someone's negligence.

Dr. Ochs—the emergency room physician who was called too late to succor Sanchez—testified extensively. But he was never asked whether the events causing Sanchez' death were of the kind which ordinarily do not occur in the absence of someone's negligence. Rather, counsel for the Hospital asked "Dr., does this kind of thing happen even though the nurses are doing their job right?" to which Dr. Ochs answered "Yes." The difficulty with the question and the answer given is that it does not meet the legal test. The law's concern is not whether such accident could possibly occur in the absence of negligence but whether it "ordinarily" occurs in the absence of negligence. (See *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489; *Zentz* v. *Coca Cola Bottling Co., supra,* 39 Cal.2d 436, 446. Thus the evidence with respect to the first element under the *Ybarra-Newing* requirement is uncontroverted; there was no issue of fact for the jury. This court also concludes the evidence presented in the trial court was sufficient to satisfy the second and third conditions for the applicability of the doctrine of res ipsa loquitur as a matter of law. Since the facts giving rise to the doctrine were undisputed, the inference of negligence arose as a matter of law. (*Newing* v. *Cheatham, supra,* 15 Cal.3d 351, 364; *Di Mare* v. *Cresci* (1962) 58 Cal.2d 292, 300 [23 Cal.Rptr. 772, 373 P.2d 860].)

■ The finding of these three conditions as a matter of law gave rise to a presumption affecting the burden of producing evidence (Evid. Code, § 646). This burden was articulated in *Newing* v. *Cheatham* in this fashion: "It then became defendant's obligation to introduce sufficient evidence to sustain a finding either that the accident resulted from some cause other than Cheatham's negligence, or, else, that Cheatham exercised due care in all possible respects wherein he might have been negligent. (See Cal. Law Revision comment to Evid. Code, § 646.)" (Pp. 364-365 of 15 Cal.3d.)

■ We therefore must examine the record to ascertain whether the Hospital has carried its burden of producing sufficient evidence to sustain a finding that either (1) the accident resulted from some cause other than the Hospital's negligence or (2) the Hospital exercised due care in all possible respects wherein it might have been negligent.

Dr. Roger Williams, pathologist, was called by the Hospital and identified seven possible causes for the brain death of Sanchez. These

were (1) irritation of the heart by the atrial catheter, (2) a vaso-vagal response, (3) thromboembolis, (4) an air embolis, (5) a surgical impediment of the medula during the cervical laminectomy, (6) aspiration of vomitus, (7) asphyxiation. Some of these were ruled out as probable causes but remained as a possible cause. According to Dr. Williams, the risk associated with the atrial catheter was that its tip when moved about inside the heart could irritate portions of the interior resulting in electrical disturbances. He further noted that the vital signs of Sanchez were consistent with this irritation. However, no EKG was administered by the Hospital during the arrest; thus it was impossible to identify the atrial catheter as the specific cause. But according to Dr. Williams, if the atrial catheter were the cause, then several treatments should have been initiated including defibrillation, repositioning of the atrial catheter, administration of CPR or drugs. Here because of the nursing staff failure to review Sanchez' chart or the failure to adequately chart or communicate this vital information, no one, neither nurse nor nurse's aide in the postoperative floor knew of the existence of the atrial catheter in the heart of Sanchez.

Furthermore, the nearest defibrillation equipment was two doors away in the intensive care unit. Had the nurses been aware of the atrial catheter, this equipment could have been brought. There was in fact no repositioning of the atrial catheter until the day following the brain death of Sanchez. The reason? Neither the nursing staff nor Dr. Ochs was aware that it was in place. Furthermore, a CPR could not have been utilized since no nursing personnel on the postoperative ward who saw Sanchez before the arrival of Dr. Ochs had any CPR training whatsoever. In attempting to assign the atrial catheter as a possible cause, the Hospital ignores this fact: The existence of the atrial catheter required a higher level of skill and care; in fact Sanchez received little or no care or attention in the critical 45 minutes before a doctor was called. Thus the admitted failure to communicate, failure to observe, failure to call a doctor to carry out the treatments before a complicated crisis level had been reached, point to the unqualified conclusion that the Hospital failed to exercise due care essential if the atrial catheter had been the cause of the accident.

Dr. Williams also identified as a possible cause a vasovagal response. This is a complicated nervous system discharge that occurs when an individual is seriously frightened or under emotional turmoil or in severe pain. Under such circumstances, the vagas nerve of the brain discharges electrical signals to a number of organs in the body often

causing disfunction of the heart and respiratory system. In a severe case, if untreated, inadequate blood profusion can result in brain damage or death. The symptoms for such a disturbance include decreasing blood pressure and circulation to the brain, loss of respiration, seizure or epilepsy convulsions. The heart may stop but the patient may commence breathing again before becoming comatose. Treatment for such a problem includes the giving of oxygen, placing the patient in the Trendelenberg position (feet up), opening the I.V. to allow a greater infusion of fluid or contacting a physician. None of these actions were taken by the nursing staff of the Hospital until it was too late. Dr. Ochs was of the opinion that this vasovagal response could not be excluded as a probable cause of death.

These facts, however, do not constitute "sufficient evidence to sustain a finding," the accident resulted from some cause other than the Hospital's negligence or that the Hospital exercised due care if this were a cause. The evidence is to the contrary.

The third possible cause, thromboembolism, consists of a blood clot which breaks free from a vein and is carried to the heart into the pulmonary arteries obstructing the flow of blood through the lungs with a potential result of brain death. Treatments for thromboembolism are embolectomy, oxygen and cardiopulmonary massage, resuscitation and medication. None of these treatments were instituted until too late. The tests done on Sanchez did not show a thromboembolism nor did the autopsy reflect this as a cause. While this cause remains a possibility, no evidence suggests the Hospital exercised due care in all possible respects wherein it might have been negligent in the treatment of such an event.

With regard to an air embolism (air bubble admitted to the vascular system), again it is conceded that none of the treatments for such an event were instituted by the Hospital. The fifth possible cause, the surgical impediment of the medula during the cervical laminectomy operation, was ruled out by Dr. Williams.

With respect to aspiration by Sanchez of vomitus, Dr. Williams concluded this was not a probable cause because of the lack of findings of aspiration and pneumonia. However, this cause remains a possibility. The significant admitted fact is that none of the treatments prescribed for such a condition were undertaken by any of the nursing staff until too late.

Finally with respect to the seventh possible cause—asphyxiation (a temporary blockage depriving the body of oxygen when the airways are obstructed)—a death occurs through the vasovagal response which causes a cardiac arrest. This event was not ruled out as a probable cause of the brain death.

In summary, under any one of Dr. Williams' possible sequences of events, there was uncontroverted evidence of negligence on the part of the Hospital's nursing staff as a proximate cause of death. To illustrate with one possible cause, the vasovagal response, the evidence is without contradiction: At 3:55 p.m. eyewitnesses observed Sanchez to be choking violently; this evidence was consistent with the recurring episodes of vomiting that had occurred since her arrival on the floor; a partial or temporary blockage of the airway caused by the vomitus could have triggered the fear mechanism resulting in the vasovagal response; the vasovagal response untreated could have resulted in the brain damage. All of the symptoms as related by Dr. Williams are consistent with those observed by the witnesses and reported by the Hospital's nursing staff. Even the cessation of breathing and a resumption before becoming comatose is consistent with observations made of Sanchez. Yet none of the procedures—which usually result in recovery of a patient suffering from such a vasovagal response—were administered by the nursing staff. Thus defendant offered no evidence whatsoever to controvert this possible cause of death and its consequent failure in its duty of care.

With respect to the cause of the "actual" death, as distinguished from "brain death," again the facts are uncontroverted. Death was caused by a failure of care in the placement of the balloon cuff on the tracheostomy tube. The trial court could properly conclude in light of the admissions contained in the Hospital record coupled with common sense and experiences, that to allow a tube to erode through the trachea into a thoracic vertabra and into an artery allowing Sanchez to bleed to death was negligence. Such negligence caused the *ultimate death* of Sanchez. The Hospital made no attempt to introduce contradictory evidence. It has not carried its burden as set forth in *Newing* v. *Cheatham* and Evidence Code section 646.

The Hospital has argued, without evidence, that the death could have resulted from causes other than the negligence of this defendant. "Mere speculation of this sort is insufficient to discharge defendant's burden of explanation." (*Newing* v. *Cheatham, supra*, 15 Cal.3d 351, 365; *Dier-*

man v. *Providence Hospital* (1947) 31 Cal.2d 290, 295, 296 [188 P.2d 12].) We conclude that the trial court correctly concluded the Hospital's negligence was established as a matter of law. The trial court committed no error in directing a verdict on the issue of liability.

## II

The Hospital next contends the trial court was obligated to allow it to reopen its case in chief. After the trial court expressed its intent to grant a directed verdict on the issue of liability, the Hospital moved to reopen its case to present further evidence disputing both the basic facts of the res ipsa loquitur presumption and the presumed fact. It offered to prove, through the expert opinion of Dr. Ochs, the conduct of the nurses leading up to his call at 4 p.m. were within the standard of prevailing care; that the events leading to the brain death of Sanchez did not imply negligence by the nursing staff but were consistent with the exercise of due care. The trial court denied this motion.

■ A motion to reopen a case for further evidence can be granted only on a showing of good cause. (*Ensher, Alexander & Barsoom* v. *Ensher* (1964) 225 Cal.App.2d 318, 326 [37 Cal.Rptr. 327].) Reopening is not a matter of a right but rests upon the sound discretion of the trial court. That discretion should not be overturned on appeal absent a clear showing of abuse. (See *Weber* v. *Marine Cooks' & Stewards' Assn.* (1949) 93 Cal.App.2d 327 [208 P.2d 1009]; *Keppelman* v. *Heikes* (1952) 111 Cal.App.2d 475, 484 [245 P.2d 54].)

■ The motion here was made after the trial court had indicated its intention to grant a directed verdict on the issue of liability after six weeks of contested trial. The offer of evidence covered areas which the defense had had the opportunity to go into at great length during the lengthy trial. The facts on which the negligence of the nursing staff was based were essentially uncontradicted. This late offer of opinion evidence by Dr. Ochs must be contrasted with his statements during the course of the trial where he found the conduct of the nursing staff to be below the standard of care in the following instances: failure to check breathing and consciousness, inadequate CPR training; failure to be aware or communicate the existence of the atrial catheter; failure to compare the 3:45 p.m. vital signs with the earlier recorded signs; Marmito's running from Sanchez' room at the point of crisis; failure to record breathing; and failure to check. During trial and in face of this testimony, Dr. Ochs stated he could not give an opinion on the conduct

of the *nurse's aide* and stated he was not an expert on postoperative nursing standards, the nursing standards in issue in this case.

In sum the Hospital sought to introduce contradictory evidence from its own witness, Dr. Ochs, to impeach his previous testimony. The Hospital sought by its motion—after an extensive and lengthy examination of witnesses by most knowledgeable and experienced counsel—to go back and to ask proper questions of those witnesses. The reason why, in light of skilled counsel's awareness of the basic rules of law and the factual development in this case, proper questions were not asked of its witnesses, is not articulated at the trial court level or here. There is no showing by affidavit or declaration the Hospital was in any way surprised by the ruling of the court. Of greater significance is the factual matrix in which the motion was denied. The record is replete with evidence, uncontradicted, as to the acts and failure to act of the Hospital personnel, causing both brain and actual death of Sanchez, thus compelling a directed verdict on this issue of liability. There appears no abuse of discretion or miscarriage of justice manifest by the court's refusal to reopen the cause.

### III

The Hospital next contends that the trial court made a series of improper evidentiary rulings. The plaintiffs were permitted over objection to question witnesses whether Sanchez' room had been fogged to prevent staph infection before she entered it. Plaintiff argued that the evidence was properly introduced to show a "pattern" of negligence. It may be conceded that this evidence concerning a staph infection or a lack thereof was irrelevant. However, the admission of these inadmissible facts recedes to insignificance in face of the vast evidence of the Hospital's negligence. Prejudice to the Hospital arises only in the realm of speculation, not in fact.

The Hospital next argues it was improperly limited in the cross-examination of plaintiffs' expert witness Dr. Jeanes. The Hospital sought to cross-examine concerning Dr. Jeanes' staff privileges at other hospitals. Why Dr. Jeanes had or did not have hospital privileges at other specific hospitals was a matter which could consume enormous amounts of time to no enlightenment on the key issues before the court. The trial court properly exercised its discretion under Evidence Code section 352 in cutting short the cross-examination on this particular subject.

The contention is made that Sue Cummings, an expert on nursing care, gave an incompetent opinion. She was asked if the decline in the condition of Sanchez from the time she arrived in her room until the arrival of Dr. Ochs ordinarily occurred in the absence of negligence. That Sue Cummings was an expert on nursing standards is not questioned. Based upon her experience and training, she indicated that a patient released from the recovery room in satisfactory condition does not normally suffer brain damage and subsequent death in the absence of negligence. Witness Cummings was not required to identify the cause of the brain death or to have expertise in this area. Rather this particular question was directed towards the first requirement for the application of the res ipsa loquitur doctrine and its effect on the burden of producing evidence. We find no error in authorizing the witness to answer this question.

As to the other objections made to specific bits of evidence, we find no basis for error in the trial court rulings. If we assume error, there would be no grounds for reversal.

In the necessarily detailed step-by-step analysis of the legal and factual issues in this case, it is not difficult to lose sight of the central and controlling facts and issues in this case. Mrs. Sanchez, a 37-year-old mother of four, underwent a common surgical procedure at the defendant Hospital and as a result of conceded failures to communicate, failures to observe, failures to take timely responsive action, failures to have adequately trained staff, Socorro Sanchez suffered brain death. Two months later under circumstances that can be characterized as no less than gross neglect, she bled to death. The judgment in favor of the surviving children of Sanchez should be affirmed.

## IV

### Plaintiff's Cross-appeal

Sanchez' cross-appeal complains of trial court error in finding the Bay General Hospital was entitled to an offset for the $45,000 paid by Kriak and Morrell.

Code of Civil Procedure section 877 provides: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to

one or more of a number of tortfeasors claimed to be liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater;..." Here Kriak and Morrell were codefendants in a single-count complaint for the wrongful death of Sanchez. They were charged with liability for this same tort, to wit, the death of Mrs. Sanchez. As was stated in *Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409, 433 [218 P.2d 17]: "Even though persons are not acting in concert, if the result produced by their acts are indivisible, each person is held liable for the whole. Death, burning of a building or sinking of a boat are such indivisible results."

This is not a situation where there were two successive independent torts committed such as in *Carr* v. *Cove* (1973) 33 Cal.App.3d 851 [109 Cal.Rptr. 449]. Plaintiff Carr sustained personal injuries in an automobile collision and two months later she was injured in a second accident. She filed a single action against both drivers, settled her claim for the first accident and executed a covenant in his favor. The court held that the mere joinder of two tortfeasors in the same action does not create an overlap of their liabilities making each responsible for the tort caused by the other nor does it automatically mean a double recovery where the plaintiff settles with one defendant and then obtains judgment against the other. Thus *Carr* v. *Cove*, involved injuries from two separate and distinct accidents. In *Helling* v. *Lew* (1972) 28 Cal.App.3d 434 [104 Cal.Rptr. 789], the facts, in broad outline, are similar to those here. The Hellings settled the wrongful death suit with the medical malpractice defendant and then proceeded against the persons responsible for the automobile accident. The appellate court held the separate action could be prosecuted but "[d]efendants are thus entitled to introduce into evidence the amount received in the settlement and to have the jury instructed that should it find in favor of the plaintiffs it must deduct the amount of the settlement from any verdict." (P. 440.)

That Kriak and Morrell would have had a right of indemnity from the Hospital had the action proceeded to judgment against all these original defendants, does not derogate from the conclusion that the Hospital has a right to offset the amounts previously paid in settlement. Principles of equitable indemnity would enable these defendants to sort

out their respective liabilities. It does not affect the right of a plaintiff to recover the entire judgment from any one of them. (See *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899].)

The judgment is in all respects affirmed.

Cologne, Acting P. J., and Work, J., concurred.

A petition for a rehearing was denied March 17, 1981, and the petition of defendant and appellant for a hearing by the Supreme Court was denied April 29, 1981.