[No. D002309. Fourth Dist., Div. One. Apr. 29, 1987.]

KRISTINA FAGERQUIST, a Minor, etc., Plaintiff and Respondent, v. WESTERN SUN AVIATION, INC., Defendant and Appellant.

710

**COUNSEL**

Kern & Wooley and Ralph S. LaMontagne, Jr., for Defendant and Appellant.

Luce, Forward, Hamilton & Scripps, Donald L. Salem, Ned Good and Michael D. Michaels for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—Western Sun Aviation, Inc. (Western Sun) appeals from the $1.5 million[1] judgment entered against it in the wrongful death action brought by Kristina Fagerquist (Kristina). Western Sun contends the damage award is excessive as a matter of law, and the special verdict finding it negligent must be set aside because of evidentiary and instructional error. The finding as to negligence is vacated; the remainder of the judgment is affirmed.

---

[1]The judgment was reduced to $1,465,000 because of settlement to Kristina Fagerquist by other entities.

## FACTUAL BACKGROUND

In October 1979, Western Sun sold David Prizio and other investors a 42X Piper aircraft. Western Sun both retails and maintains the aircraft it sells. The engines of the plane purchased by Prizio were manufactured by Avco Lycoming, Inc. (Lycoming). Prizio leased the aircraft to Air Bahia which flew commercially between California, Arizona and Mexico. Kristina's father, Thomas Fagerquist (Fagerquist), was an Air Bahia pilot and killed when the plane crashed due to engine malfunction.

Western Sun performed a scheduled maintenance on the 42X Piper, a 100-hour inspection and a compression check, replacing the No. 6 left cylinder with a new cylinder manufactured by Lycoming. Three days later, Fagerquist, piloting a different aircraft, flew from San Diego to Long Beach. Upon his return to San Diego, Air Bahia had Fagerquist change aircraft. Fagerquist completed the remaining legs of his flight plan in the 42X Piper. Fagerquist performed a "run up" on the aircraft and determined it was running rough. Western Sun sent a mechanic to check the plane. The mechanic did some trouble-shooting and cleaned and replaced some parts in the engine before the plane was tested. On that test, the engine checked out satisfactorily.

Fagerquist then flew the plane without incident from San Diego to Tijuana and then to Guaymas. However, from Guaymas to Tuscon, Arizona, the left engine ceased functioning and the plane crashed. Experts determined the left engine failed because of a hole in the No. 6 cylinder caused by defective casting in the manufacturing process.

## PROCEDURAL BACKGROUND

Kristina sued Western Sun on two theories: Strict products liability for selling a defective aircraft and engine parts, and negligently maintaining the airplane. Although Kristina's second amended complaint identified the defective parts sold as the cylinder and piston assembly manufactured by Lycoming, she did not sue Lycoming. Western Sun cross-complained against Lycoming for total indemnification; however, this cross-complaint was deemed barred when Lycoming's $20,000 payment to Kristina and $20,000 to Prizio was found to be a good faith settlement. (Code Civ. Proc., § 877.6.)[2]

The jury returned special verdicts finding the Lycoming cylinder which failed had been defectively manufactured, the Lycoming engine had been defectively designed, and both defects proximately caused the fatal accident. A separate finding declared Western Sun's negligence also proximately

---

[2]Western Sun does not challenge the finding of good faith.

caused the accident. Thus, Western Sun's liability was based on both strict products liability, because it retailed Lycoming's defective products, and its own negligence.

I

On appeal, Western Sun seeks reversal of the damages portion of the judgment only, conceding the liability aspect of the judgment is proper because it is strictly liable for retailing the engine cylinder and a defective engine. Although conceding the judgment should be sustained upon a strict liability theory, Western vigorously urges us to consider and pass upon asserted reversible errors connected with the negligence aspect of the judgment. The nature of Western Sun's request is unusual. █ "Ordinarily, when an appellate court concludes that affirmance of the judgment is proper on certain grounds it will rest its decision on those grounds and not consider alternative grounds which may be available. [Citations.]" (*Filipino Accountants' Assn.* v. *State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023, 1029-1030 [204 Cal.Rptr. 913].) Generally, a ruling, decision or judgment if right upon any theory of the law applicable to the case must be sustained regardless of the considerations which may have contributed to the challenged ruling, decision or judgment. (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) Appellate courts sometimes depart from this rule when the nonessential matter is of great importance to the parties and may serve to avoid future litigation, or where the issue presented is of continuing public interest and is likely to recur. (*Filipino Accountants' Assn.* v. *State Bd. of Accountancy, supra,* 155 Cal.App.3d at p. 1030.) We find this is such a case.

Western Sun has filed a third party cross-complaint for total indemnification against Lycoming in federal court and, unless the negligence finding is vacated, the res judicata effect of this finding will defeat the claim for indemnification. Kristina, on the other hand, argues the issues raised in connection with the negligence aspect of the judgment need not be addressed because the action for total indemnification will be barred even though the judgment is based solely on strict liability, making the negligence finding moot. (*Standard Pacific of San Diego* v. *A. A. Baxter Corp.* (1986) 176 Cal.App.3d 577 [222 Cal.Rptr. 106].) As to Kristina, this position is sound; however, the issue remains of substantial importance to the federal court proceeding between Western Sun and Lycoming.

The holding of *Standard Pacific* is that when a settlement has been confirmed as being made in good faith, Code of Civil Procedure section 877.6, subdivision (c) bars the remaining nonsettling tortfeasors from maintaining an action for total indemnity, regardless whether their liability is vicarious or otherwise imposed as a matter of policy. (*Id.* at p. 592.) The deci-

sion recognizes existing appellate authority is split and the Supreme Court has not resolved the issue. Although *Standard Pacific* declined to follow the holdings in *Angelus Associated Corp.* v. *Neonex Leisure Products, Inc.* (1985) 167 Cal.App.3d 532 [213 Cal.Rptr. 403], and *Huizar* v. *Abex Corp.* (1984) 156 Cal.App.3d 534 [203 Cal.Rptr. 47], declaring the bar of Code of Civil Procedure section 877.6, subdivision (c) applies to actions for partial indemnification only and not to actions for total indemnification, the intermediate appellate decisions to the contrary have not been overruled by California's highest tribunal.

Kristina argues the federal court will be obligated to follow *Standard Pacific* and determine Western Sun's action for total indemnification barred. ■ However, federal courts are not bound by a particular state court holding when there is a split among the intermediate state courts which has not been resolved by the state Supreme Court. (See *Aydin Corp.* v. *Loral Corp.* (9th Cir. 1983) 718 F.2d 897, 904; *Erie R. Co.* v. *Tompkins* (1938) 304 U.S. 64, 78 [82 L.Ed. 1188, 1194, 58 S.Ct. 817, 114 A.L.R. 1487]; and *West* v. *A. T. & T. Co.* (1940) 311 U.S. 223 [85 L.Ed. 139, 61 S.Ct. 179, 132 A.L.R. 956].) Thus, the strict liability finding supporting the judgment entered against Western Sun does not bar its action for total indemnification as a matter of law. On the other hand, Western Sun's negligence cannot be relitigated in the federal actions under the principle of res judicata.

Because a finding of negligence absolutely determines the total indemnification action in federal court, and a judgment based solely on strict liability based on manufacturing and design defects of which Western Sun, as a retailer, could not have been aware may not be barred, we address the issues raised relative to the negligence finding.

## II

Western Sun contends the court erred in ruling it could not present evidence that conduct of nonparties (e.g., Lycoming) caused the plane crash. Western Sun argues it should be allowed to "point the finger" at others who were at fault to show Western Sun was "zero percent at fault." The court held such evidence irrelevant and advised "you can defend yourself by either [plaintiff's] failure to prove that your client was negligent to any degree or your overcoming any evidence that they may present that your client was not negligent at all, but I don't think it is necessary that you prove anybody else's negligence." In sum, Western Sun contends evidence of nonparty conduct should be admitted to prove it did not negligently maintain the ill-fated aircraft and to prove also that if the products were defective, Western Sun could not have discovered the defects with reasonable inspection.

Western Sun relies on *Newing* v. *Cheatham* (1975) 15 Cal.3d 351 [124 Cal.Rptr. 193, 540 P.2d 33], *Irwin* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709 [184 Cal.Rptr. 228], and *Sanchez* v. *Bay General Hospital* (1981) 116 Cal.App.3d 776 [172 Cal.Rptr. 342]. These inapposite cases do not support Western Sun's position. They discuss the evidentiary rule permitting defendants to produce evidence they were not negligent or that their negligence was not the proximate cause of the accident (Evid. Code, § 646.) when the facts give rise to application of the doctrine of res ipsa loquitur from which a strong probability of negligence may be inferred.

Here, Western Sun was not precluded from defending against Kristina's proof it was negligent. This is not a res ipsa loquitur case, and the burden of establishing Western Sun's personal negligence was Kristina's.

In rejecting Western Sun's request, the court observed that interjecting the issue of nonparty fault would tend to confuse the jurors and distract them from their responsibility to find negligence on the part of Western Sun, if it exists. The potential for prejudice to a plaintiff when a party defendant is permitted to argue that nonparties are at fault is explained in *Klemme* v. *Hoag Memorial Hospital Presbyterian* (1980) 103 Cal.App.3d 640 [163 Cal.Rptr. 109]. While the erroneous interjection of nonparty proportionate negligence and the jury distractions created thereby were found not to be so prejudicial as to require a reversal in *Klemme,* the court here followed a correct and more practical course in rejecting it altogether.

### III

Western Sun also contends the court improperly instructed the jury on negligence per se, based on Federal Aviation Administration (FAA) regulations violations. Western Sun argues the instructions were erroneously given because (1) a causal connection was not established between the regulation violations and the accident, (2) the regulations failed to set a specific standard of care, and (3) the burden of proving proximate causation was improperly shifted to Western Sun who was required to rebut the presumption of causation. (Evid. Code, § 669.)

As read to the jury, the challenged instructions state: "If you find that Western Sun Aviation violated any of the statutes and regulations which I am about to read to you, and that such violation was a proximate cause of injury to another or to himself, you will find that such violation was negligence, unless Western Sun proffers by a preponderance of the evidence that it did what might reasonably be expected of a person of ordinary prudence acting under similar circumstances would decide to comply with the law. [¶] In order to sustain such burden of proof, Western Sun must prove by a

preponderance of the evidence that it was faced with circumstances which prevented compliance or justified noncompliance with the statute or regulation. [¶] Each person—Federal Regulation 3.813-A [*sic*] [43.13(a)] provides that, 'Each person maintaining or altering, or performing maintenance shall use methods, techinques and practices acceptable to the administrator. [¶] You shall use the tools, equipment and test apparatus necessary to assure completion of the work in accordance with accepted industry practices. If special equipment or test apparatus is recommended by the manufacturer involved, he must use that equipment or apparatus, or its equivalence acceptable to the administrator.' [¶] Federal Aviation Requlation section 43.13-B [*sic*] [(b)] provides that, 'Each person maintaining or altering, or performing preventive maintenance shall do that work in such manner, and use tools of such a quality that the condition of the aircraft, air frame, aircraft engine, propeller, or assigns work done will be at least equal to the original or properly altered condition with regard to aerodynamic function, structural strength, resistance to vibration, and deterioration, and other qualities affecting airworthiness.' [¶] Federal Aviation Regulation section 43.15-A [*sic*] [(a)] provides that, 'General, each [person] performing a 100-hour annual, or progressive inspection required by part one [*sic*] [ninety-one] of this chapter or an inspection required under Part 123 of this Chapter shall perform those inspections in such a manner as to detertmine whether the aircraft concerned meets all applicable airworthiness requirements. [¶] Federal Aviation Regulation section 43.15-C [*sic*] [(c)] provides that, 'Annual and 100-hour inspections: One, each person performing an annual or 100-hour inspection shall use a checklist while performing the inspection. The checklist may be of the person's own design, one provided by the manufacturer, or equipment being inspected, or one obtained from another source.' [¶] 'This checklist must include the scope and detail of the items contained in the appendix B to this Part.' [¶] In Paragraph B of this section, subparagraph 2: 'Each person approving an aircraft for return to service after an annual or 100-hour inspection will, before that approval, run the aircraft engine or engines to determine satisfactory performace in accordance with the manufacturer's recommendations of one, power outlet, static and idle R.P.M.; two, mag needles [*sic*] [magnetos]; three, fuel and oil pressure; four, cylinder and oil temperature.' [¶] Federal Aviation section 1345421 [*sic*] [135.421] provides that, 'Each person operating an aircraft under Part 145.421 of a time certificated for a passenger seating configuration excluding any pilot seats of nine seats or less, must comply with the manufacturer's recommended programs for each aircraft engine.' [¶] 'B. For the purpose of this section, a manufacturer's maintenance manual for maintenance instructions set forth by the manufacturer as required by this chapter for the aircraft and aircraft engines.' [¶] With respect to the plaintiff s burden of proof under theory of negligence, if you find that the defendant Western Sun violated one or more of the regulations previously read to you, the burden of proof

on the issue of causation shifts from the plaintiff to the defendant, that either defendant Western Sun has the burden of proving that any violation of the regulations was not a proximate cause in bringing about plaintiff's injuries and damages."

A. *14 Code of Federal Regulations, section 43.15(c)(1):*

Western Sun contends the jury was improperly instructed pursuant to 14 Code of Federal Regulations, section 43.15(c)(1), because, as a matter of law, a violation of this regulation could not have proximately caused the accident. We disagree.

Evidence Code section 669 provides in pertinent part: "(a) The failure of a person to exercise due care is presumed if: [¶] (1) He violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"(b) This presumption may be rebutted by proof that: [¶] (1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; ..."

The question of proximate cause is ordinarily a question of fact, but becomes one of law where the facts are uncontroverted and only one deduction or inference may reasonably be drawn. (*Whinery* v. *Southern Pac. Co.* (1970) 6 Cal.App.3d 126, 128 [85 Cal.Rptr. 649], *Sanders* v. *Atchison, Topeka & Santa Fe Ry. Co.* (1977) 65 Cal.App.3d 630, 648-649 [135 Cal.Rptr. 555].) Western Sun's argument that failure to utilize a checklist during inspection of an aircraft could not as a matter of law have proximately caused the accident, while *technically* correct, is without substantive merit.

"The FAA is required by the Federal Aviation Act of 1958 to adopt minimum standards governing the design, construction and performance of aircraft. (49 U.S.C. § 1421(a)(1).)" (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 547 [208 Cal.Rptr. 874, 691 P.2d 630].) The maintenance regulations at issue here, governing the performance of the aircraft, were enacted by the FAA in compliance with the act and are manifestly aimed at protecting the public. (49 U.S.C. §§ 1424 and 1425, see also *Elsworth, supra,* 37 Cal.3d at p. 551, *French* v. *C. A. B.* (10th Cir. 1967) 378 F.2d 468, 471.) The purpose of the section 43.15(c)(1) requirement that a checklist

must be used during performance inspections is to ensure detection of problems or malfunctions by the mechanic(s) inspecting the aircraft for safety and airworthiness. (See, e.g., 14 C.F.R. §§ 33.1, 33.3, 33.5.)[3]

Plaintiff's theory at trial was Western Sun was liable for the accident because it negligently inspected and maintained the aircraft. The evidence at trial suggests Western Sun's mechanics did not at all times use a checklist during inspection. Further, the record supports that if a checklist had been properly utilized and the mechanical history of the aircraft properly noticed, the crack in the left engine cylinder would have been discovered. Thus, whether the mechanics complied with the checklist requirement and whether the failure to comply with the checklist requirement was the proximate cause of the accident were questions of fact for the jury to determine.

**B.** *14 Code of Federal Regulations, sections 43.13(a) and (b), 43.15(a), and 135.421*:

■ Western Sun contends these regulations were improper because they fail to set forth a specific standard of care necessary to apply the doctrine of negligence per se. In other words, they are too general to establish a standard of care. Western Sun relies upon holdings in *Endicott* v. *Nissan Motor Corp.* (1977) 73 Cal.App.3d 917 [141 Cal.Rptr. 95, 9 A.L.R. 4th 481], *Rimer* v. *Rockwell Intern. Corp.* (6th Cir. 1981) 641 F.2d 450, and *King* v. *Avtech Aviation, Inc.*, (5th Cir. 1981) 655 F.2d 77, to support its arguments.

---

[3]These sections provide:

"§ 33.1 Applicability. (a) This part prescribes airworthiness standards for the issue of type certificates and changes to those certificates, for aircraft engines.

"(b) Each person who applies under Part 21 for such a certificate or change must show compliance with the applicable requirements of this part."

"33.3 General. Each applicant must show that the aircraft engine concerned meets the applicable requirements of this part."

"33.5 Instruction manual for installing and operating the engine.

"Each applicant must prepare and make available to the Administrator prior to the issuance of the type certificate, and to the owner at the time of delivery of the engine, approved instructions for installing and operating the engine. The instructions must include at least the following:

"(a) *Installation instructions.* (1) The location of engine mounting attachments, the method of attaching the engine to the aircraft, and the maximum allowable load for the mounting attachments and related structure.

"(2) The location and description of engine connections to be attached to accessories, pipes, wires, cables, ducts, and cowling.

"(3) An outline drawing of the engine including overall dimensions.

"(b) *Operation instructions.* (1) The operating limitations established by the Administrator.

"(2) The power or thrust ratings and procedures for correcting for nonstandard atmosphere.

"(3) The recommended procedures, under normal and extreme ambient conditions for—
(i) Starting; (ii) Operating on the ground; and (iii) Operating during flight."

*Endicott* was a product liability action involving an automobile seat belt which broke when the plaintiff lost control of his car, struck an embankment and rolled over. At trial, the plaintiff argued the seat belt was defective because it did not comply with former Vehicle Code section 27300 which required: "Any safety belt or safety harness installed in a vehicle and large enough to accommodate an adult person shall be designed and installed in such manner as to prevent or materially reduce the movement of the person using the same in the event of collision or upset of the vehicle." The Court of Appeal rejected plaintiff's claim the court erroneously refused to instruct the jury on a negligence per se theory based on the allegation the seat belt did not meet the safety standards prescribed by section 27300, stating: "Such an instruction was unwarranted in that plaintiff failed to offer any evidence that the design of the seat belt violated the statute. The statute did not specify physical engineering standards. [Fn. omitted.] Rather it provided in general terms that a seat belt or harness must 'prevent or materially reduce the movement of the person using the same in the event of collision or upset of the vehicle.' In this lengthy record there is no testimony that plaintiff's belt did not materially reduce his movement before it ruptured, and the fact that he was not thrown from his vehicle supports an inference that the belt reduced his movement to some degree. No technical evidence was produced to show any violation of the more detailed engineering safety standards . . . [prescribed elsewhere by the Civil Aeronautics Administration]; for, as previously noted, not enough of the belt had been preserved to make such evidence possible. Thus, . . . substantial evidence of any statutory violation is lacking." (*Endicott* v. *Nissan Motor Corp., supra,* 73 Cal.App.3d at pp. 928-929.)

*Rimer* v. *Rockwell Intern. Corp., supra,* held a pilot's failure to inspect a gas cap was not contributory negligence per se on the basis it violated FAA regulations which provided: " 'The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of the aircraft.' 14 C.F.R. § 91.3(a) (1978) . . . 'No person may operate a civil aircraft unless it is in airworthy condition, . . . the pilot in command of a civil aircraft is responsible for determining whether that aircraft is in condition for safe flight.' 14 C.F.R. § 91.29 (1978)." (*Rimer, supra,* 641 F.2d at pp. 454-455.) The court of appeals observed these regulations were general in nature and did not create specific duties. "There are no regulations which specifically require a pilot to check the physical security of the fuel cap by physically removing it. In the absence of this type of regulation Rimer was not negligent per se. [Fn. omitted.]" (*Id.* at p. 455.)

In *King* v. *Avtech Aviation, Inc., supra,* 655 F.2d 77, the contention a violation of 14 Code of Federal Regulations section 91.163 constituted negligence per se was also rejected. Section 91.163 provided the owner or operator of

an aircraft is primarily responsible for maintaining the aircraft in an airworthy condition. The court held although the regulation was clearly aimed at safety, it did not require specific conduct and was thus far too broad to establish a standard of care. (*Id.* at p. 79.)

· The cases Western Sun relies on establish the doctrine of negligence per se is not applicable unless the statute, rule or ordinance allegedly violated sets forth a specific standard of conduct.

However, the regulations under scrutiny in the context of this case are part of a regulatory scheme governing maintenance of aircraft which have been certified as airworthy. (14 C.F.R. § 43.1.)[4] Section 43.13, entitled "Performance rules (general)," directs work performed on aircraft must be performed according to the "current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, or other methods, techniques, and practices acceptable to the Administrator. . . ." Section 43.13(b) further specifies the object of such maintenance work is to ensure the condition of the aircraft "will be at least equal to its original . . . condition (with regard to aerodynamic function, structural strength, resistance to vibration and deterioration, and *other qualities affecting airworthiness*)." (Italics added.) 14 Code of Federal Regulations, section 135.421 also requires compliance with the manufacturer's recommended maintenance programs "which is contained in the maintenance manual or maintenance instructions set forth by the manufacturer *as required by this chapter* . . . ." (14 C.F.R. § 135.421(b), italics added.)

The maintenance manuals provided by Piper Aircraft and Lycoming were introduced into evidence and testimony of expert witnesses and mechanics for Western Sun confirmed adherence to the directives of the manuals is required by the FAA. To ensure maintenance and airworthiness inspections are properly performed so that aircraft meet "all applicable airworthiness requirements" (§ 43.15(a)(1)), section 43.15(c) (also read to the jury) specifies the inspection shall be performed by use of a checklist which "may be of the person's own design, one provided by the manufacturer of the equipment being inspected or one obtained from another source." This section, however, requires the checklist to include the scope and detail of the items contained in an appendix to this part.

This appendix entitled "Scope and Detail of Items (as Applicable to the Particular Aircraft) To Be Included in Annual and 100-Hour Inspections,"

[4]14 Code of Federal Regulations, section 43.1 provides in pertinent part: "(a) Except as provided in paragraph (b) of this section, this part prescribes rules governing the maintenance, preventive maintenance, rebuilding, and alteration of any (1) Aircraft having a U.S. airworthiness certificate. . . ."

discloses the *specific* items to be inspected during aircraft inspections. The regulations require *specific* conduct or actions by those individuals charged with the inspection-maintenance responsibilities. This regulatory scheme, which includes the regulations challenged here, prescribes conduct that is both safety oriented *and* specific. Evidence showed the required checklist was provided for the maintenance inspections of the aircraft. Further, they specified the exact steps a mechanic should take when seeing any signs of trouble during inspections.

While this appendix was not read to the jury, there was ample evidence to find the mechanics responsible for maintaining and inspecting the aircraft had a specific duty to follow the details prescribed by the maintenance manuals. Although the regulations specifically delineating the steps to be taken during a maintenance/inspection of an aircraft were not read (nor requested to be read) to the jury, and although the regulations actually read are more general in nature, we find no prejudicial error in view of the wealth of evidence regarding the specific conduct required during such maintenance/inspections.

C. *Over Western Sun's objection, the court instructed:*

"With respect to the plaintiff's burden of proof under theory of negligence, if you find that the defendant Western Sun violated one or more of the regulations previously read to you, the burden of proof on the issue of causation shifts from the plaintiff to the defendant, that either defendant Western Sun has the burden of proving that any violation of the regulations was not a proximate cause in bringing about plaintiff's injuries and damages."

This instruction is based on the rationale in *Haft* v. *Lone Palm Hotel* (1970) 3 Cal.3d 756 [91 Cal.Rptr. 745, 478 P.2d 465] and significantly eased plaintiff's burden in establishing liability on the negligence theory. In the absence of this special instruction, Fagerquist as plaintiff would have the burden to prove not only that Western Sun failed to comply with the federal regulations in maintaining the aircraft, but also that the failure to comply proximately caused the death in this case.

Public policy has grafted a narrow exception to the general rule where a defendant's failure to comply with mandatory requirements of a statute or regulation prevents plaintiffs from conclusively proving their injuries were proximately caused by that failure. In *Haft,* a hotel owner failed to provide a lifeguard to protect patrons from swimming pool injuries even though a lifeguard's presence was statutorily required. Two persons drowned. Although there were no witnesses to establish the presence of a lifeguard would have prevented the drownings, the court held that once the statutory

violation was shown and *there was a strong suggestion* the presence of a life-guard would have avoided or at least minimized the damages, policy weighed in favor of shifting the burden on causation to the defendant. In *Haft,* it was deemed unfair to allow a defendant to take advantage of a plaintiff's inability to establish proximate cause solely because the defendant failed to abide by the law. Had a lifeguard been present either the drownings would not have occurred or, if they did occur, there would be a witness who could testify to the cause of the drownings. Since the question of whether having had a lifeguard in place would have prevented the drownings or minimized the injuries could only be speculated, policy required a defendant to bear the burden of showing failure to provide the lifeguard was not a causal factor in the drownings.

In the present case, the accident killed the only occupant of the plane, the pilot. There is ample evidence to show Western Sun failed to provide the level of service and maintenance required by the federal regulations. The trial court erroneously believed the shifting-burden instruction was required by this court's opinion in *McGee* v. *Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179 [188 Cal.Rptr. 542]. In *McGee* the Court of Appeal found the trial court erred in refusing to instruct the jury that an aircraft manufacturer defendant, Cessna, had the burden of proving an aircraft passenger's postcrash injuries were not proximately caused by Cessna's violating FAA regulations. We held Cessna actually bore the burden of proof *under the facts of that case* and that an instruction substantially the same as the one to which Western Sun now objects, should have been given.

In *McGee* the experts were in conflict as to proximate cause and the crash had destroyed the aircraft. However, because the FAA regulations allegedly violated went to requirements for basic aircraft design, the *failure of compliance* could be deduced from examination of an aircraft identically manufactured. There was evidence from which the jury could conclude Cessna violated FAA regulations intended to protect aircraft occupants from post-crash fire injuries of the nature McGee incurred after a clearly survivable crash. The regulations required a shield between the engine and the cockpit passengers to be able to prevent flames from intruding into the cockpit for a period of 15 *minutes.* Because the fire destroyed the shield in the crash-aircraft, it was not available for testing. *McGee* stretched *Haft's* policy analysis to apply where a failure to comply with a safety regulation caused the shield to be destroyed in less than 40 *seconds,* preventing inspection. Thus, the failure to provide a flame-resistant shield for the required 15 minutes was substantially likely to have caused the burn injuries to the passenger *and* was the factor which caused the evidence to be unavailable to plaintiffs at trial.

██ When the person injured is of the class the regulations violated are designed to protect and the injury is the type the regulation was promulgated to avoid, there is an inference the injury proximately flowed from the violation. In *McGee* that inference was sufficient to shift the burden.

██ However, the inference of causation in this case is not as direct as in *Haft* or *McGee*. Here, the defective number-six cylinder in the aircraft engine almost certainly caused or at least contributed to the accident. The cylinder was defective when manufactured by Avco and then later retailed to the owner of this airplane and installed by Western Sun. Although Western Sun accepts liability under a strict warranty theory, it does not necessarily follow its sale and installation were negligent. The real thrust of Fagerquist's case is that had Western Sun complied with the strict inspection and maintenance regulation requirements *after* installation, it would have detected the defective cylinder and made repairs before the crash.

Western Sun admitted the defect in the cylinder's casting had developed into a crack following installation while being operated at normal combustion temperatures. The hole which eventually developed in the cylinder was not related to the manner in which the pilot operated the aircraft. It was the hole which would set off the chain of mechanical problems which made the airplane lose the power of one engine immediately before the crash.

Western Sun's expert, Savage, stated the pilot would experience a rough-running engine during the time erosion of the defective cylinder was taking place. It is precisely this complaint which the pilot brought to Western Sun's attention before taking off on the fatal flight and to which Western Sun's allegedly negligent maintenance inspection was directed. Its only response was to clean the fuel injectors although Western Sun knew its personnel had cleaned the fuel injectors three times in the preceding two months. Since this procedure had not been required at all in the previous 10 months, this should have alerted it that it should perform a *float check* to see if the latest problem was because the injector nozzles were malfunctioning, or if the cause was due to reduced compression. A compression check would have detected a leakage from the cylinder, but not necessarily a defective casting which had not yet developed into any opening in the metal. *Even placing a hand in proximity to the cylinder wall* would have indicated a cylinder which lacks compression because it will be cooler than those which are properly burning their fuel. Although Western Sun's shop chief stated it was proper procedure for a trouble-shooter inspecting clogged injector nozzle to hand-test the cylinders, this was not done on September 30th. Thus, the evidence supports a finding the crack in the cylinder, which eventually caused overheating and the resultant oil fire, was present and detectable at the time Western Sun was called to trouble-shoot the September 30th complaint of left-engine-

running-rough. Moreover, had a boroscope been utilized the crack would have been visible. (A boroscope is an optical device inserted into the cylinder through the sparkplug hole to view the interior surface.) Therefore, it appears there is a strong suggestion that proper maintenance, as required by regulations, would have prevented the accident.

However, in spite of some similarities to the issues discussed in *Haft* and in *McGee,* there are significant differences. First, the evidence was not destroyed by the crash so as to prevent accident reconstruction, analysis and scientific examination of the defective cylinder and engine. In fact, the engine test following the crash showed the defective cylinder had lost compression and it was removed and examined. Second, the regulation violations here do not directly go to the inability of plaintiff to establish proximate causation.[5] Here, contrary to the facts in *Haft,* compliance with the regulatory requirements would not have eased plaintiff's evidentiary burden in proving Western Sun's negligent inspection and maintenance proximately caused the accident. Thus, the policy reasons relied on in *Haft* and as applied in *McGee* are not present here.

■ While the evidence is certainly sufficient to sustain a finding of negligence, it is not conclusive as a matter of law and a contrary verdict, i.e. a finding that plaintiff did not carry the burden of proof on the issue of proximate causation, is also supportable. Because it is reasonably probable a more favorable verdict as to Western Sun's negligence liability would have resulted had the jury been properly instructed on the burden of proof regarding proximate cause, the finding as to negligence is vacated. (*Cervantez v. J. C. Penney Co.* (1979) 24 Cal. 3d 579 [156 Cal.Rptr. 198, 595 P.2d 975].)

IV

Western Sun meritlessly claims the award of $1.5 million to Kristina is so excessive as a matter of law it must be deemed the result of passion or prejudice, asserting: "[T]he jury took one look at a poor young girl, brain damaged from birth, and compensated her *not* for the loss she sustained as a result of the death of her father, but rather for the substantial losses she sustained as a result of *the fact she is brain damaged.*" (Original italics.)

Kristina was born with severe brain and other physical defects making her totally dependent on others. Because of numerous severe birth defects, she has had several surgeries, is unable to speak clearly, must have dental work performed under general anesthesia, is unable to eat properly, suffers from

---

[5]In fact, witnesses testified to the manner in which the airplane fell from the sky, the defects and the pilot's lack of contributory negligence, i.e. the lack of pilot error.

constant diarrhea, cannot walk normally and is severely mentally retarded. Although she requires constant supervision and care, her life expectancy is 69.7 years. Kristina was ten years old when her father died, her mental development was approximately that of a three-year-old child and her communication skills were equivalent to those of a nine-month-old child. Kristina communicated her needs by sign language which her father understood and used with her better than anyone else.

Substantial evidence showed Kristina and her father had a special relationship. Despite her handicaps, Kristina appreciated her father's love, affection and attention; responded meaningfully to his affection; and was extremely happy when they were together. Kristina's mother states she was unable to give Kristina the positive opportunities and experiences her husband gave to the child. He exposed Kristina to activities the mother could not provide, taking her sailing. He discussed plans for the child's future growth and development.

Seven other witnesses described the positive relationship between Fagerquist and Kristina. Although divorced from Kristina's mother, Fagerquist shared in Kristina's custody and care and spent quality time with her. There was a deeply caring and loving relationship between the two. Nothing and no one interfered with their relationship or their time together.

A. Western Sun argues Fagerquist paid only $150 per month child support. At $1,800 a year, over Fagerquist's life expectancy the total amount of lost support to Kristina "could not have exceeded $70,000." From this premise, it concludes the amount awarded for *noneconomic* losses exceeds $1.4 million, a sum excessive as a matter of law because it bears no reasonable relationship to Kristina's pecuniary or economic losses.

■ The rules governing appellate review of a claim of excessive damages are succinctly summarized in *Seffert* v. *Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507 [15 Cal.Rptr. 161, 364 P.2d 337]: "The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question. An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (See *Schroeder* v. *Auto Driveway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662]; see also *Bertero*

v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].)

Western Sun cites *Estate of D'India* (1976) 63 Cal.App.3d 942 [134 Cal.Rptr. 165], for the proposition recovery for noneconomic losses, such as loss of comfort, society, companionship, advice and training, are recoverable only "to the extent that [they] . . . may be assessed in *pecuniary* terms under the evidence in the particular case." (*Id.* at p. 947; original italics.) Since the award for noneconomic losses in the present case is 15 times greater than the presumed amount awarded for Kristina's economic losses, Western Sun argues the award, therefore, is clearly excessive. Western Sun's measuring device for "pecuniary loss" is overly restrictive and narrow. ■ "Damages in a wrongful death action are limited to the pecuniary loss suffered by one because of the death of another. [Citations.] This limitation, however, does not prevent recovery for loss of . . . comfort and society . . . provided these elements are considered in reasonable relation to pecuniary loss. [Citations.]" (*Fields* v. *Riley* (1969) 1 Cal.App.3d 308, 313-314 [81 Cal.Rptr. 671].)

"In measuring the damages suffered . . . [in a wrongful death action,] the jury . . . [is] entitled to consider the loss of society and comfort suffered . . . . There is no fixed and absolute yardstick by which a court on appeal can measure the value of these elements of damage, it being sufficient if the amount awarded appears to bear a reasonable relation to the elements of loss entitled to be considered by the jury, and the fixing of the amount is committed first to the sound discretion of the jury and second to the like discretion of the trial judge in passing on a motion for new trial. [Citation.]" (*Lasater* v. *Oakland Scavenger Co.* (1945) 71 Cal.App.2d 217, 220 [162 Cal.Rptr. 486].) (See also *Merlo* v. *Standard Life & Acc. Ins. Co.* (1976) 59 Cal.App.3d 5, 17 [130 Cal.Rptr. 416].) In *Estate of D'India, supra,* 63 Cal.App.3d 942, the evidence of the surviving plaintiff's loss of comfort, society and support was in conflict and the appeal was from a finding by the probate court payments made to the plaintiff by the decedent did not constitute "support." The Court of Appeal concluded plaintiff did not establish as a matter of law a pecuniary loss of support in consequence of the death of the plaintiff's mother and there was sufficient evidence in the record to support the findings of the probate court. ■ By contrast here, the uncontradicted evidence showed Kristina suffered loss of support, comfort, love, affection and guidance as a result of the death of her father. It was within the discretion of the jury to attempt to place a "pecuniary" value to these intangible losses suffered by Kristina. That evaluation is not so excessive as to raise a presumption it resulted from passion or prejudice. (See *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 466 [136 Cal.Rptr. 653].) That Western Sun has cited reported factually distinguish-

able cases where children have been awarded less for the wrongful death of their parents does not alter our conclusion about the propriety of this award.

B. ▮ Finally, Western Sun suggests Kristina's mental retardation must be deemed to preclude her from appreciating her father's love and companionship as fully as if she were a "normal" child. Therefore, it alleges the value of lost comfort and society must be less than if she were not retarded. It then argues excessiveness of the award becomes even more pronounced when one proportionalizes the award given this handicapped child to an equivalent, but greater, amount to which a "normal" child would have to be entitled.

Western Sun's argument relies on language in *Zaninovich* v. *American Airlines, Inc.* (1966) 26 App.Div.2d 155 [271 N.Y.S.2d 866, 873], suggesting a mongoloid child's share of a settlement for the wrongful death of both parents could be justifiably less than that given to each of her three healthy siblings, in part because of her inability to ever perceive the intangible loss from her parents' death. In upholding the trial court's award, the appellate court in *Zaninovich* was faced with a problem not present here, how to divide a single award among four minor parentless children. By reducing the amount available to the mongoloid two and one-half-year-old child, the court justified increasing the amounts available to her nonhandicapped seven- and five-year-old, and seven-month-old sisters. The court considered the handicapped child's proven *shortened life expectancy* and speculated a proper allocation between the children would justify awarding her a lesser share because trial evidence showed she could be institutionally maintained for no more than $200 per month during her reduced lifetime. Thus, the court considered multiple factors in *Zaninovich* which do not exist here. Further, its speculation regarding the mongoloid child's limited capacity to appreciate parental comfort and support is not documented. This is not suprising because it appears to be contrary to fact. Persons suffering from mongolism (Down's Syndrome) are defined as "unusually sociable and affectionate." (III The New Encyclopedia Britannica, Ready Reference and Index (15th ed. 1981) Micropaedia, "Down's Syndrome," p. 648.)

Here, the jury evaluated Kristina's loss knowing she will likely remain "childlike" while living out her remaining 69.7 years of life expectancy. It would not have been unreasonable for it to have found she would be more seriously damaged by loss of her father than a child who might be able to compensate for this deprivation through normal maturation, rather than less.

DISPOSITION

Judgment as to the finding of negligence is vacated; the remainder of the judgment is affirmed.

Benke, J.,* concurred.

**WIENER, Acting P. J.,** Concurring and Dissenting.—I agree with everything set forth in the majority opinion except that part which states "Western Sun *meritlessly* claims the award of $1.5 million to Kristina is so excessive as a matter of law it must be deemed the result of passion or prejudice . . . ." (Maj. opn., *ante,* p. 726, italics added.) I believe the argument has merit. Accordingly, I would modify the judgment.

We are told that before we can reverse the judgment on the ground the verdict is excessive the verdict must be so large that it shocks the conscience and suggests passion, prejudice, or corruption on the part of the jury. (*Schroeder* v. *Auto Driveaway Co.* (1974) 11 Cal.3d 908, 919 [114 Cal.Rptr. 622, 523 P.2d 662]; *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 64 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) This general statement, however, with such apparent simplistic clarity hardly serves as an objective basis for appellate action. We know that if we were to conduct a survey on the damage award in this or other cases we would receive varied responses—some judges would be outraged at the size of the verdict; others, such as the majority, would conclude the verdict is within a reasonable range. I believe the judicial process involving trial court review of allegedly excessive verdicts in new trial motions or later appellate review requires a more principled approach applying objective guidelines rather than the personal, visceral response of the individual trial judge or the collective viscera of a three-judge appellate panel.

Inherent in our notion of justice is the concept of uniformity—people in more or less similar positions should receive equal treatment. The justice system should not be viewed as a sporting venture where certain lucky ones can win the "Big Spinoff" simply because a particular jury happens to be inordinately generous with someone else's money. Fairness requires that persons who receive certain types of injuries with resultant economic loss should be compensated in a rational manner comparable to others with similar injuries. Not only is this uniformity essential for respect for our justice system, but reasonable predictability is essential for those obligated to cover these financial risks. We expect insurers and business institutions to effectively plan for contingencies arising from loss due to injuries or death.

*Assigned by the Chairperson of the Judicial Council.

Lack of uniformity can create difficult, if not impossible, problems in planning to cover these losses if the range of damages borders on the infinite governed only by the amorphous standard of conscience.

The rational source of planning should rest with the courts which have the expertise and experience to digest jury verdicts. Courts should be, and are able to extrapolate relevant data from these cases to set reasonable ranges of settlement values to assist counsel at pretrial conferences such that settlements can be reached without the need for trial. Thus because of the theoretical and practical importance of judicial control over runaway verdicts, courts *must* act to revise those verdicts when they are incorrect, doing so in an objective manner. When courts, including appellate courts, fail to so act they jeopardize the system creating an incentive for those with gambling instincts. When courts act in an objective manner they not only benefit the immediate parties to the case, but they supply a rational order to be applied in other cases.

I would not want these remarks to suggest I expect mathematical precision in reaching an award of damages in any tort case including those for wrongful death. "Insistence on mathematical precision would be illusory and the judge or juror must be allowed a fair latitude to make reasonable approximations guided by judgment and practical experience." (*Whitaker* v. *Blidberg Rothchild Company* (4th Cir. 1961) 296 F.2d 554, 555 quoted in *Sea-Land Services, Inc.* v. *Gaudet* (1973) 414 U.S. 573, 590 [39 L.Ed.2d 9, 24, 94 S.Ct. 806].)

Using that judgment and practical experience here I believe we can and should be guided by how California law treats similar causes of action and the results reached in other cases in this and other jurisdictions.

When I say how California treats similar causes of action I refer to the fact that we do not permit a child to maintain a cause of action for loss of parental consortium resulting from wrongful injury to the parents for the negligence of a third party. (*Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858].) Thus here, if Western Sun's conduct had caused Kristina's father to become a quadriplegic or to be in a coma Kristina would receive nothing even though her damages would be identical to those suffered because of her father's wrongful death.

I do not mean that *Borer,* which makes clear that it does not deal with the statutorily authorized cause of action for wrongful death, should control our thinking. (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d at pp. 451-452.) I do say that the policy statements expressed in *Borer* must be considered in evaluating damage awards for loss of consortium arising from the

wrongful death of a parent. "Loss of consortium is an intangible, nonpecuniary loss; monetary compensation will not enable plaintiffs to regain the companionship and guidance of a mother; it will simply establish a fund so that upon reaching adulthood, when plaintiffs will be less in need of maternal guidance, they will be unusually wealthy men and women. To say that plaintiffs have been 'compensated' for their loss is superficial; in reality they have suffered a loss for which they can never be compensated; they have obtained, instead, a future benefit essentially unrelated to that loss.

"We cannot ignore the social burden of providing damages for loss of parental consortium merely because the money to pay such awards comes initially from the 'negligent' defendant or his insurer. Realistically the burden of payment of awards for loss of consortium must be borne by the public generally in increased insurance premiums or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. We must also take into account the cost of administration of a system to determine and pay consortium awards; since virtually every serious injury to a parent would engender a claim for loss of consortium on behalf of each of his or her children, the expense of settling or litigating such claims would be sizeable." (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d at p. 447.)

*Borer* also points out the difficulty of determining the proper amount of damages in the context of loss of parental consortium explaining, "Plaintiffs here have prayed for $100,000 each; yet by what standard could we determine that an award of $10,000 was inadequate, or one of $500,000 excessive?" (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d at p. 448.)

Code of Civil Procedure section 377 provides that an heir is entitled to maintain an action for damages against the person causing the death and is entitled to such damages "as under all the circumstances of the case, may be *just,* . . ." (Italics added.) Those damages include the financial support which the child would have received from the deceased and the reasonable compensation for the loss of love, companionship, comfort, affection, care, advice, guidance, education, training, protection, services, society, solace, or moral support, and any other benefits which the child has lost by reason of his or her parent's death. In more general terms the damages are broken down into economic and noneconomic categories. In this case the economic damages of $150 monthly child support does not translate into more than $100,000. The bulk of the $1.5 million award represents noneconomic damages.

I wholeheartedly and enthusiastically agree with the majority's statement that Kristina was particularly vulnerable to her father's loss. Nonetheless her

award must be evaluated in the context of other awards in California. In making this evaluation I have reviewed and considered the results of at least 50 cases in California and elsewhere involving damages for wrongful death. There is no case in which the economic losses are as small as they are here where the noneconomic loss for a single child is as large as the one which the majority has now approved.

In generalizing from these cases I believe it is fair to say that invariably the largest component of a plaintiff's award is for loss of support. Here loss of support is only about $100,000.

Another relevant factor on whether the verdict is excessive is to consider the trial record and the value placed on the case by plaintiff's counsel. If there is anyone who should have insight as to what a fair award of damages should be it is the plaintiff's lawyer who has lived with the case and appreciates its nuances and subtleties. The plaintiff's lawyer in this case is a highly respected experienced expert in aircraft litigation. He is a superb advocate who obviously has the ability to communicate his sense of compassion, fairness and sympathy to the jury.

In arguing damages to the jury plaintiff's counsel explained Kristina's father had a life expectancy of 39.1 years. He said there was nothing stronger than the love of a parent for a child. Counsel suggested that if there were a tragic event and a parent could not live to assist his child the parent would be pleased if he or she could at least have the ability to hire somebody as a replacement to assist in doing those things that would have been done by the now deceased parent. Counsel argued, "And if one could have someone they could count on for the rest of their life, . . . if they could hire somebody like that at $25,000 a year in today's purchasing power, and I'm not talking about the shrinking value of money, that would be $977,500 if you multiply it out. [¶] Now that doesn't mean you are going to take that as the approach or the formula, but it is something that may be of guidance to you."

Counsel legitimately left the amount of damages to the jury. His suggestion, however, as to how they should reach their conclusion is meaningful. In broad terms counsel asked the jury to return an award of a million dollars. I think it reasonable to conclude that an award is excessive when it exceeds the amount sought by plaintiff's lawyer by a factor of 50 percent; $500,000 in absolute terms.

But even if we were to adopt counsel's argument that a fair award of $25,000 annually is appropriate, the determination of the gross amount does not equal $977,500. That amount ignores the yield on capital. If we use the present value table and the low yield of 5 percent the total amount necessary

to produce $25,000 annually for 39 years is approximately $425,500, less than half of what counsel argued to the jury. Thus here I believe one can reasonably conclude that plaintiff's counsel thought the case, including both economic and noneconomic loss, did not exceed $525,000.

Based upon the foregoing I conclude the amount of damages is excessive. This conclusion is based on the fact the award is disproportionate to the amounts awarded in other cases both here and in other states and substantially exceeds the amount sought by plaintiff's counsel. The award reflects the concern expressed in *Borer* that Kristina has received a future benefit unrelated to her loss. (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d at p. 447.) Consequently, I would modify the judgment.[1] Because I have been unable to persuade either of my colleagues that a modification of damages is legally necessary, the specific amount of damages which I believe is proper becomes irrelevant.

Appellant's petition for review by the Supreme Court was denied July 23, 1987.

---

[1] A recent federal case using the same analysis as I have, reached a similar result. (See *Trevino* v. *United States* (9th Cir. 1986) 804 F.2d 1512.)