[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1292 
 I. INTRODUCTION
Real parties in interest Serafina Labo (Serafina), Florence Crick (Florence), and John Labo (John), are the wife, daughter, and son, respectively, of the decedent Anatalio Labo (Anatalio).[1] Real party in interest Nard Labo (Nard) is also a son of Anatalio and is mentally disabled. Serafina, Florence, John and Nard each brought a wrongful death claim against defendant Harry Knowles, alleging that Anatalio died as a result of Knowles's professional medical negligence. Knowles filed this petition for writ relief after the trial court denied his motion for summary judgment and/or adjudication as to the wrongful death claims.
Knowles contends that Serafina, Florence and John's wrongful death claims are barred by the statute of limitations contained in Code of Civil Procedure section 340.5[2] because they each discovered their claims more than one year before filing suit. We agree with this contention. Knowles also claims that Nard cannot establish any loss of companionship damages associated with his father's death because it is undisputed that due to a head injury and the resulting disability, Nard believes his father is alive. We disagree that Nard's belief that his father is alive necessarily prevents him from establishing such damages. Accordingly, we grant the petition in part and deny it in part.
 II. FACTUAL AND PROCEDURAL BACKGROUND
On November 20, 2000, Anatalio was admitted to Green Hospital for the endovascular treatment of renal artery stenosis and the repair of an abdominal aortic aneurysm. On that same day, Knowles performed renal arterial stenting to treat the renal stenosis. The next day, surgeons Ralph Dilley and Alana Chock performed a repair of the abdominal aortic aneurysm. Anatalio died on November 24, 2000, while hospitalized. *Page 1294 
Serafina authorized an autopsy to be performed that same day and, within two weeks of Anatalio's death, requested copies of his medical records. Real parties in interest retained Forrest Adams, a medical consultant, to review Anatalio's medical records. Serafina, Florence, and John each suspected medical negligence shortly after Anatalio's death. On November 7, 2001, Serafina, Florence, John and Nard each brought wrongful death claims against Green Hospital of Scripps Clinic, Scripps Health, Dilley, and Chock, as well as 100 Doe defendants. (Labo v. GreenHospital of Scripps Clinic et al. (Super Ct. San Diego County, 2001, No. GIC777900) (Green Hospital action)).
While that case was pending, Serafina, Florence, John and Nard's attorney consulted with another doctor regarding Anatalio's death. In October 2002, this doctor informed Serafina, Florence, John and Nard's attorney that Knowles may have done something during the renal stenting procedure that caused internal bleeding. On November 6, 2002, Serafina, Florence, John and Nard filed this wrongful death action against Knowles. They each alleged that Anatalio's death was the result of Knowles's professional negligence in performing the renal stenting.
Nard appears in this action through his guardian ad litem, Robert Crick. As a result of a mental disability, Nard is unaware his father has died. Nard is not seeking economic damages in this action.
On December 19, 2002, real parties in interest dismissed theGreen Hospital action with prejudice. Thereafter, Knowles moved for summary judgment as to the wrongful death claims of Serafina, Florence and John in this case, on the ground that their actions were barred by the statute of limitations in section 340.5. In the same motion, Knowles moved for summary adjudication of Nard's claim on the ground that Nard could not establish damages, as a matter of law. The trial court denied Knowles's motion for summary judgment and/or summary adjudication in its entirety.
Knowles filed a writ petition in this court in which he claimed that the trial court improperly denied his motion for summary judgment and/or adjudication. We issued an order to show cause why the relief should not be granted and stayed further proceedings in the trial court.
 III. DISCUSSION
A. Appropriateness of Writ Relief and Standard of Review
Our review of Knowles's petition is governed by the following well-established principles. "An order denying a motion for summary judgment *Page 1295 
may be reviewed by way of a petition for a writ of mandate. [Citation.] Where the trial court's denial of a motion for summary judgment will result in a trial on nonactionable claims, a writ of mandate will issue. [Citation.] Since a motion for summary judgment `involves pure matters of law,' we review a ruling on the motion independently. [Citation.] Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. [Citation.]" (Prudential Ins. Co. of America, Inc. v. SuperiorCourt (2002) 98 Cal.App.4th 585, 594-595 [119 Cal.Rptr.2d 823].)
B. The Wrongful Death Claims of Serafina, Florence and John Are Barred by the Statute of Limitations in Section 340.5 Because They Discovered Their Claims More Than One Year Before Filing Suit
Knowles claims that Serafina, Florence, and John's wrongful death claims are barred by the statute of limitations contained in section 340.5 because they each discovered their claims more than one year before filing suit. We agree.[3]
Section 340.5 provides in relevant part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through theuse of reasonable diligence should have discovered, the injury,
whichever occurs first." (Italics added.)
(1) It is well established that, "`[t]he term "injury," as used in section 340.5, means both a person's physical condition and its negligent cause.'" (Davis v. Marin (2000)80 Cal.App.4th 380, 385 [94 Cal.Rptr.2d 896].) However, a person need not know of the actual negligent cause of an injury; meresuspicion of negligence suffices to trigger the limitation period. (See Norgart v. Upjohn Co. (1999) 21 Cal.4th 383,397-398 [87 Cal.Rptr.2d 453, 981 P.2d 79] (Norgart); Jolly v.Eli Lilly Co. (1988) 44 Cal.3d 1103, 1110-1111
[245 Cal.Rptr. 658, 751 P.2d 923] (Jolly).)
In Jolly, the plaintiff knew that her mother had taken the synthetic drug estrogen diethylstilbestrol (DES). (Jolly,supra, 44 Cal.3d at p. 1107.) The plaintiff also suspected, by 1978, that DES was a defective product and that it was a cause of the plaintiff's cancer. (Id. at p. 1108.) However, the plaintiff delayed legal action because she did not know the identity of the DES manufacturer. (Ibid.) In 1980, the Supreme Court decided Sindell v. Abbott Laboratories (1980)26 Cal.3d 588 [163 Cal.Rptr. 132, 607 P.2d 924], which *Page 1296 
held that a plaintiff could state a claim without knowing the actual manufacturer of the DES at issue in the plaintiff's particular case. The plaintiff in Jolly sued in 1981. The trial court granted a defense summary judgment motion based on the statute of limitations. On review, the Jolly court rejected the notion that a plaintiff must have knowledge of specific facts establishing misconduct in order to discover a cause of action. (Jolly, supra, 44 Cal.3d at pp. 1110-1111.) Instead, theJolly court held that a plaintiff discovers her cause of action when she suspects negligence: "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her. . . . plaintiff need not be aware of the specific `facts' necessary to establish the claim; that is a process contemplated by pretrial discovery. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, she must decide whether to file suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her." (Ibid., fn. omitted.)
In Norgart, supra, 21 Cal.4th 383, the Supreme Court applied the discovery rule as defined by Jolly, supra, 44 Cal.3d 1103, to bar a wrongful death cause of action brought in 1991 by a parent against a pharmaceutical company that had manufactured a drug the parent alleged contributed to his daughter's suicide in 1985. The Norgart court explained that the parent was suspicious of the cause of his daughter's death shortly after she died: "Leo admitted that, `[a]t or around the time of Kristi's death,' he suspected that `something wrong' had happened to her to cause her death: he `thought' that `there had to be some reason, other than just herself, that would cause her to commit suicide,' that `there had to be some other force or action upon her that caused her to commit suicide. . . .' He thereby impliedly admitted — to quote Jolly — that he `suspect[ed] . . . that someone ha[d] done something wrong' to cause her death. (Jolly v. Eli Lilly Co., supra, 44 Cal.3d at p. 1110.) He also admitted that, prior to mid-1986, he had formed a belief that an `individual or individuals . . . did something wrong to [her] that caused her to take her own life,' and had begun to contemplate bringing an action for wrongful death. He further admitted that the `individual or individuals' in question were her husband Steven, for what he suspected was physical abuse, and her psychiatrist Dr. Apostle, for what he suspected was professional negligence. He thereby expressly admitted — to quoteJolly again — that he `suspect[ed] . . . that someone,' indeed two specific persons, `ha[d] done something wrong' to cause her death. (Jolly v. Eli Lilly Co., supra, 44 Cal.3d at p. 1110.)" (Norgart, supra, 21 Cal.4th at pp. 405-406.)
Thus, in Norgart, supra, 21 Cal.4th 383, the court held that the plaintiff's suspicions of negligence as a contributing factor in his daughter's suicide triggered the statute of limitations, even though the plaintiff did not suspect *Page 1297 
the precise manner by which the wrongdoing occurred. (Id. at p. 406.) The court did not focus on when the plaintiff became suspicious that the pharmaceutical company had been negligent.[4]
Similarly, in Dolan v. Borelli (1993) 13 Cal.App.4th 816
[16 Cal.Rptr.2d 714] (Dolan), the Court of Appeal applied Jolly,supra, 44 Cal.3d 1103, in concluding that the statute of limitations set forth in section 340.5 barred a medical malpractice action brought by a patient against a doctor who had performed surgery to eliminate pain associated with carpal tunnel syndrome. (Dolan, supra, 13 Cal.App.4th at p. 819.) In Dolan,
the doctor told the patient that she should be free from pain within 60 days after the surgery. (Id. at p. 820.) However, when the patient continued to experience pain more than 60 days after the surgery, she believed the doctor had performed the surgery improperly. (Ibid.) The patient consulted another physician who performed a second operation. The precise nature of the initial physician's negligence was revealed during the second surgery. (Ibid.) The Court of Appeal rejected the patient's argument that the statute of limitations began to run from the date of the second operation. The court reasoned, "As discussed in Jolly, the essential inquiry is when did [the patient] suspect [the first doctor] was negligent, not when did she learn precisely how he was negligent." (Dolan, supra, 13 Cal.App.4th at p. 824.)
In Rivas v. Safety-Kleen Corp. (2002) 98 Cal.App.4th 218, 226
[119 Cal.Rptr.2d 503] (Rivas), the court noted that in 1991, the plaintiff was diagnosed with a malfunctioning kidney and was told by his doctor to avoid contact with a solvent, Safety-Kleen, which was used at his workplace. In 1996, the plaintiff submitted a workers' compensation claim that attributed his disease to exposure to toxic fumes, gases, and liquids at work. (Ibid.) In 1998, the plaintiff filed a personal injury lawsuit against the manufacturer of Safety-Kleen. (Ibid.) The plaintiff claimed the statute of limitations did not bar his action because, pursuant to the discovery rule, the limitations period did not begin to run "until the injured party has been explicitly informed by his doctors that a certain substance or product caused the medical disorder or has had an opportunity to personally review medical records specifying the cause of the disorder." (Id. at. p. 228.) The Rivas court rejected this claim and held that "the fact that [the plaintiff] filed a workers' compensation claim in September 1996 based on exposure to toxic chemicals at work is definitive proof that he had a suspicion that `someone ha[d] done something wrong to *Page 1298 
[him]' long before his civil complaint was filed in April 1998. (Jolly v. Eli Lilly Co., supra, 44 Cal.3d at p. 1110)." (Rivas, supra, 98 Cal.App.4th at p. 229.)
(2) We glean from Jolly, supra, 44 Cal.3d 1103, and its progeny that a plaintiff need not know the precise manner in which a wrongdoer was negligent in order to discover his or her injury, within the meaning of section 340.5. In the aftermath ofJolly, courts have rejected the argument that the limitations period does not begin to run until a plaintiff learns the specific causal mechanism by which he or she has been injured. (See Rivas, supra, 98 Cal.App.4th at p. 229; Dolan, supra,
13 Cal.App.4th at p. 824.)
In this case, Serafina, Florence, and John each suspected negligence associated with Anatalio's death shortly after he died on November 24, 2000. Serafina and Florence each admitted in their statement of undisputed facts in opposition to Knowles's motion for summary judgment that they suspected medical negligence immediately following Anatalio's death. John testified in his deposition that he had conversations with his mother shortly after his father died that caused him to suspect wrongdoing in connection with his father's death:
"Q. I'm trying to find out, when is the first time you personally suspected that something had been done inappropriately that led to your father's death?
"A: I had suspicions based on my mom's statements, but I wanted to hear the results of the autopsy. I wanted to hear what [the family's attorney] had to say."
These admissions establish as a matter of law that shortly after Anatalio's death, Serafina, Florence, and John each "suspect[ed] . . . that someone ha[d] done something wrong" to cause his death. (Jolly, supra, 44 Cal.3d at p. 1110.)[5]
Therefore, Serafina, Florence, and John all discovered their wrongful death claims shortly after November 24, 2000.
Serafina, Florence, and John contend that the statute of limitations in section 340.5 did not begin to run when they suspected medical negligence, but, rather, when they specifically suspected Knowles's negligence. All of their arguments are premised upon this contention. First, they argue that Jolly, *Page 1299 supra, 44 Cal.3d 1103, and Norgart, supra, 21 Cal.4th 383, are not applicable because those cases discuss the statute of limitations formerly applicable to products liability actions (former § 340, subd. (3)), rather than section 340.5. However, it is well established that Jolly's discussion of the discovery rule applies to actions involving section 340.5. (See, e.g.,Kitzig v. Nordquist (2000) 81 Cal.App.4th 1384, 1391
[97 Cal.Rptr.2d 762] [applying Jolly/Norgart analysis to § 340.5 case]; Dolan, supra, 13 Cal.App.4th at p. 824 ["the Jolly
analysis applies to section 340.5"]; Rose v. Fife (1989)207 Cal.App.3d 760, 769, fn. 9 [255 Cal.Rptr. 440] [same].)
Second, Serafina, Florence, and John argue that the use of the phrase "such person's alleged professional negligence" in section 340.5 requires that the limitations periods defined in the statute be analyzed with respect to a particular defendant's negligence. (§ 340.5, italics added.) We disagree. As noted above, section 340.5 provides in relevant part: "In an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be three years after the date of injury or one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, whichever occurs first."
(3) Pursuant to the plain language of section 340.5, it is the discovery of "the injury," rather than the discovery of a particular defendant's negligence, that triggers the limitations period. The use of the term "such person's alleged professional negligence" in section 340.5 merely defines the type of action subject to the statute; it does not define the limitations period contained therein.
Third, Serafina, Florence, and John also rely on the Court of Appeal's recent decision in Fox v. Ethicon Endo-Surgical, Inc.
(2003) 112 Cal.App.4th 1572 [6 Cal.Rptr.3d 300], review granted February 18, 2004, S121173 (Fox), in arguing that the statute of limitations was not triggered in this case until they suspected Knowles's negligence. The Fox court disagreed with this court's conclusion in Bristol-Myers Squibb Co. v. SuperiorCourt (1995) 32 Cal.App.4th 959 [38 Cal.Rptr.2d 298] (Bristol-Myers Squibb Co.), disapproved on other grounds inNorgart, supra, 21 Cal.4th 383, 410, footnote 8, that the discovery of a professional negligence cause of action necessarily triggers the discovery of a products liability cause of action associated with the same medical procedure. (Fox,supra, 112 Cal.App.4th at p. 1589.) In Bristol-Myers SquibbCo., supra, 32 Cal.App.4th at pages 961-962, 966, this court considered whether a plaintiff's products liability cause of action against a breast implant manufacturer was triggered by her suspicion that the doctor who performed the implant surgery had committed medical malpractice. This court held, "When a plaintiff has cause to sue based on knowledge *Page 1300 
or suspicion of negligence the statute starts to run as to all
potential defendants." (Id. at p. 966.)
We reject Serafina, Florence, and John's argument for two reasons. First, because the Supreme Court has granted review inFox, we may not rely on that decision. (See Cal. Rules of Court, rules 976, 977.) Second, we also need not rely on the imputed discovery doctrine developed in Bristol-Myers SquibbCo., supra, 32 Cal.App.4th 959, to resolve this case. InBristol-Myers Squibb Co., this court held that a plaintiff's suspicion of a surgeon's medical malpractice triggers the statute of limitations for a products liability claim against the manufacturer of materials used in the surgery. (Id. at p. 966.) Unlike the products liability claim at issue in Bristol-MyersSquibb Co., Serafina, Florence, and John's wrongful death causes of action against Knowles were within the scope of their initial suspicion of medical negligence. They knew, or should have known, that Knowles had performed the initial surgery, and they suspected that some form of medical malpractice caused Anatalio's death four days later.
(4) We also reject Serafina, Florence, and John's related contention that because their initial investigation did not lead them to suspect Knowles had been negligent, they did not discover their cause of action against him until October 2002, when a second consultant's opinion led them to suspect Knowles's negligence. It is a plaintiff's suspicion of negligence, rather than an expert's opinion, that triggers the limitation period. The limitations period begins when the plaintiff's suspicions are aroused. The period is not affected by the plaintiff's diligence in finding facts to support his lawsuit. For example, inKleefeld v. Superior Court (1994) 25 Cal.App.4th 1680
[31 Cal.Rptr.2d 12], the court rejected a plaintiff's argument that his diligence in pursuing his suspicions regarding a connection between his wife's death and the defendant's treatment was relevant to the running of the statute of limitations: "[A] plaintiff's diligence after he has become suspicious of wrongdoing is not relevant to the running of the statute of limitations. Diligence is only relevant to determine when heshould have suspected wrongdoing. Once a plaintiff actually has the requisite suspicion, the statute of limitations commences to run. It is not tolled by efforts to learn more about the matter short of filing suit." (Id. at p. 1684.)
(5) Finally, Serafina, Florence, and John argue that public policy supports their interpretation of section 340.5. The gist of this argument is that starting the limitations period upon a generic suspicion of negligence rather than upon a suspicion that a particular defendant has been negligent will require the needless naming of defendants as to whom no suspicion has yet arisen. The short answer to this concern is that plaintiffs have a year from their initial suspicion to investigate and bring suit. Moreover, in many cases, as *Page 1301 
both Jolly and Norgart discuss, this one-year period may be extended by the proper filing and amendment of a Doe complaint. (See Norgart, supra, 21 Cal.4th at p. 408; Jolly, supra,
44 Cal.3d at p. 1118.)[6]
In summary, we conclude the limitations period in this case was triggered when Serafina, Florence, and John suspected medical negligence, rather than when their investigation premised upon that suspicion led them to suspect that Knowles had been negligent. Accordingly, their lawsuit against Knowles, which was filed nearly two years after they first suspected medical negligence, is barred by the one-year statute of limitations contained in section 340.5.
C. Knowles Has Not Made a Prima Facie Showing That Nard Cannot Establish Wrongful Death Damages
Knowles claims that the undisputed fact that Nard believes his father is alive creates a prima facie inference that Nard has suffered no damages associated with his father's death. Knowles claims that such inference shifted the burden to Nard to present evidence of his damages in opposing Knowles's motion for summary adjudication.
In Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826
[107 Cal.Rptr.2d 841, 24 P.3d 493] (Aguilar), the Supreme Court outlined the relevant burdens in determining a defendant's motion for summary judgment or adjudication. "A defendant bears the burden of persuasion that `one or more elements of' the `cause of action' in question `cannot be established,' or that `there is a complete defense' thereto. [Citation.] [¶] . . . [T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. [Citation.] No more is called for." (Id. at pp. 850-851.)
In this case, it is undisputed that "As a result of Nard Labo's head injury and the resulting disability he does not know that his father is deceased."[7] It *Page 1302 
is also undisputed that Nard is not claiming any economic damages. We conclude that these facts do not constitute a sufficient prima facie showing that Nard cannot, as a matter of law, establish wrongful death damages associated with the loss of his father.
(6) It is well established that the children of a decedent in a successful wrongful death action "are entitled to reasonable compensation for the loss of love, companionship, comfort, affection, society, solace, or moral support suffered as a result of the death." (Rufo v. Simpson (2001) 86 Cal.App.4th 573, 614
[103 Cal.Rptr.2d 492].) In Krouse v. Graham (1977) 19 Cal.3d 59
[137 Cal.Rptr. 863, 562 P.2d 1022] (Krouse), in describing the long-standing precedent supporting the recoverability of such damages, the Supreme Court outlined the types of evidence relevant to establishing their existence in a particular case: ". . . California courts have uniformly allowed wrongful death recovery for loss of the society, comfort, care and protection afforded by the decedent. . . . [¶] . . . [A]s early as 1911, we held that damages could be recovered for the loss of a decedent's `society, comfort and protection' [citation]. . . . Other cases have held admissible such evidence as the closeness of the family unit [citation], the warmth of feeling between family members [citation], and the character of the deceased as `kind and attentive' or `kind and loving' [citation]. Not only was wrongful death compensation awarded historically to heirs who had been financially dependent upon their deceased relatives, but adult children received substantial awards for the wrongful death of retired, elderly parents [citation] and parents received compensatory damages for the death of young children. [Citations.]" (Krouse, 19 Cal.3d at pp. 67-68.)
(7) This court has expressly rejected the argument that mental retardation necessarily renders a person less able to suffer loss of companionship damages in a wrongful death action. (See Fagerquist v. Western Sun Aviation, Inc. (1987)191 Cal.App.3d 709, 729 [236 Cal.Rptr. 633] (Fagerquist).) InFagerquist, we upheld a $1.5 million judgment in a wrongful death action in favor of a "severely mentally retarded" 10-year-old girl whose father was killed in a plane crash. (Id.
at p. 727.) We noted that the girl's "mental development was approximately that of a three-year-old child and her communication skills were equivalent to those of a nine-month-old child." (Ibid.) We rejected the defendant's argument that the girl's "mental retardation must be deemed to preclude her from appreciating her father's love and companionship as fully as if she were a `normal' child." (Id. at. 729.) On the contrary, we held, "It would not have been unreasonable for [the jury] to have *Page 1303 
found [the girl] would be more seriously damaged by loss of her father than a child who might be able to compensate for this deprivation through normal maturation, rather than less." (Ibid., italics added.) In addition, we expressly rejected the notion that mental retardation necessarily results in a "limited capacity to appreciate parental comfort and support." (Ibid.) For example, we noted that "Persons suffering from mongolism (Down's Syndrome) are defined as `unusually sociable and affectionate.' (III The New Encyclopedia Britannica, Ready Reference and Index.) (15th ed. 1981) Micropaedia, `Down's Syndrome,' p. 648.)" (Fagerquist, supra, 191 Cal.App.3d at p. 729.) Fagerquist demonstrates that courts will not simply presume that persons with mental defects are unable to suffer wrongful death damages.
In this case, Knowles has not produced any evidence regarding the extent of Nard's injuries or the manner by which those injuries render Nard unable to suffer the loss of his father. There is nothing in the record to suggest that Nard's guardian would not be able to demonstrate that Nard has suffered from the loss of his father's love and companionship, despite Nard's lack of knowledge of his father's death. Therefore, we conclude Knowles has not met his "burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (Aguilar, supra, 35 Cal.4th at p. 850.) Accordingly, the trial court properly denied Knowles's motion for summary adjudication as to Nard's claim.
 IV. CONCLUSION
Serafina, Florence, and John each discovered their wrongful death claims against Knowles more than one year before filing their complaint in this case. Therefore, their wrongful death claims are barred by the statute of limitations in section 340.5. Accordingly, Knowles is entitled to summary judgment as to Serafina, Florence, and John's claims.
Knowles has not made a prima facie showing that Nard cannot establish wrongful death damages. Accordingly, the trial court properly denied Knowles's motion for summary adjudication as to Nard's claim. *Page 1304 
 V. DISPOSITION
Let a writ of mandate issue ordering the superior court to: (1) vacate that portion of its order denying Knowles's motion for summary judgment as to Serafina, John, and Florence's wrongful death claims, and (2) enter a new order granting Knowles's motion for summary judgment as to Serafina, John, and Florence's wrongful death claims. In all other respects the petition is denied. The stay issued by this court on December 23, 2003, is vacated. The parties shall bear their own costs in this writ proceeding.
Huffman, Acting P.J., and McDonald, J., concurred.
The petition of real parties in interest for review by the Supreme Court was denied August 11, 2004.
[1] We use first names for purposes of clarity and intend no disrespect.
[2] All subsequent statutory references are to the Code of Civil Procedure unless otherwise specified.
[3] Knowles did not move for summary judgment of Nard's cause of action on this ground.
[4] The Norgart court also noted that even if the plaintiff had not actually suspected the pharmaceutical company of wrongdoing, he had reason for such suspicion because of a warning label associating the drug with suicide in patients who took the drug while suffering from symptoms of depression. (Norgart,supra, 21 Cal.4th at p. 407.)
[5] John argues that his deposition testimony indicates that "he waited to learn the facts before forming an opinion" regarding his father's death. Even assuming this is an accurate statement, the limitations period is not triggered when a plaintiff forms an opinion that wrongdoing has occurred. Rather, as discussed above, under Jolly, supra, 44 Cal.3d 1103, the plaintiff's mere suspicion of negligence triggers the statute. John's admission that he had such "suspicions based on [his] mom's statements," expressly meets the Jolly test.
[6] Real parties in interest included Doe defendants in theGreen Hospital action. Those defendants were dismissed in April 2002 by the trial court. In noting that the Supreme Court has referred to the availability of the Doe procedure and the relation back doctrine, we do not express an opinion on the availability or proper use of that procedure in the GreenHospital action.
[7] We note that the undisputed fact that Nard does not know that his father is dead is different from Knowles's assertion in his brief that it is undisputed that Nard believes his father is alive. However, real parties in interest appear to acknowledge that Nard believes his father is alive in their opposition by positing that, "Nard may have chosen to believe his father is alive precisely because to admit he is dead is too painful for him." In any event, for the reasons described below, we conclude that Knowles is not entitled to summary adjudication of Nard's wrongful death claim under either circumstance. *Page 1305