Filed 7/29/21  Barrett v. Hershey CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THOMAS J. BARRETT, | |
| Plaintiff and Appellant, | G060211 |
| v. | (Super. Ct. No. 17CV001179) |
| ALLEN HERSHEY et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Monterey County, Susan J. Matcham, Judge.  Affirmed.

Monterey Legal Associates and Darrell D. Moon for Plaintiff and Appellant.

Sheuerman, Martini, Tabari, Zenere & Garvin and Michael J. Garvin for Defendants and Respondents.

Appellant Thomas J. Barrett (Barrett) appeals from the summary judgment entered in favor of respondents Allen Hershey, M.D., and Precision Orthopedics, a Medical Corporation (collectively, Dr. Hershey), on his medical malpractice claim. The sole issue is whether the claim was barred by the statute of limitations for actions based on a healthcare provider's alleged professional negligence. (See Code Civ. Proc., § 340.5.)[1] It was, and we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

From the parties' undisputed facts, and the unchallenged exhibits in support and opposition to the summary judgment motion, we have culled the following:

On December 16, 2015, Barrett went to Dr. Hershey's office for treatment of a chronically sore osteoarthritic knee. As they had in the past, they agreed Barrett would receive a cortisone injection into the knee to relieve the pain. This was not the first time Barrett had been treated by Dr. Hershey, including an earlier cortisone injection in the same knee, and their doctor-patient relationship spanned over 20 years.

Barrett watched as Dr. Hershey began to prepare a syringe for injection. He noticed the doctor was not wearing gloves, although this was not unusual because he had not worn gloves in the past when administering an injection. Barrett saw Dr. Hershey "dr[a]w up the injection," turn around, and accidentally poke himself with the hypodermic needle. He said, "Ow," and then "everything hit the floor, syringe, needle, everything." Dr. Hershey picked the apparatus up off the floor, removed and discarded the needle, replaced it, and using the same syringe, injected its contents into Barrett's knee joint. When asked at his deposition how clean the floor was in the treatment room, Barrett quipped, "How clean can a doctor's office be?"

Barrett also noticed Dr. Hershey did not wash his hands that day, either before the procedure or after picking the syringe up off the floor. Similarly, Dr. Hershey

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

did not cleanse the injection site either before or after the injection, which Barrett said was different from his prior injections.

By the evening of the next day, December 17, Barrett began experiencing increased pain in his knee. On December 18, Barrett's wife or daughter called Dr. Hershey's office, but were told Dr. Hershey could not be reached and if Barrett's pain was severe, he should be seen at the hospital. Finally, by December 19, Barrett's leg hurt so badly he could barely walk; it was extremely swollen and the skin around the knee was warm.

Thus, on the morning of December 19, Barrett's daughter took him to the Salinas Valley Memorial Hospital Emergency Room, where ER Dr. Ian Stehmeier confirmed Barrett's right knee was swollen, painful, and warm to the touch. Barrett said a syringe was used to aspirate two vials of gray-colored fluid from his knee, and he watched as it was drawn up into the syringe. The fluid looked to him like pus, he knew pus meant an infection, and realized that his knee was indeed infected. In fact, Barrett told his daughter, "I don't think I'm going home today." He was correct.

Later that day, Barrett was seen by hospitalist Dr. Mario Cole. Cole said Barrett told him he had come to the hospital because his right knee had become significantly worse shortly after he had an injection in his orthopedist's office on December 16. He explained Dr. Hershey had given him an injection of what he thought was cortisone in his right knee, and within 24 hours he developed pain and swelling, which progressed to severe pain by the time he showed up at the ER.

Dr. Cole consulted with the on-call orthopedist, Dr. Justin Swan. Although Dr. Cole was unsure whether Barrett's symptoms might be a result of arthritic pseudogout, he was "still cautious about the potential for septic arthritis as [Barrett] recently had a joint in[j]ection and states that the symptoms got worse after that." He also noted: "[Barrett] also has low-grade fevers . . . [and Barrett's] joint analysis also suggest[s] possible septic arthritis." Cole's "impression" was that it was a "septic right

3

knee versus [pseudogout]" because "the description of the aspirate being remarkably purulent suggest[s] that this may actually be septic joint." In addition, the initial lab results showed a high number of white blood cells, but no calcium pyrophosphate crystals in the synovial fluid indicative of pseudogout. Barrett was started on intravenous antibiotics, and Cole admitted him to the hospital.

The next day, December 20, Dr. Cole confirmed that final lab tests showed the knee was indeed infected. He and Dr. Swan made a "plan" for a "wash out" of the knee later that day. Barrett was then seen by Dr. Swan. Swan and Barrett discussed an "incision, debridement, and lavage for a likely septic joint[.]" Barrett agreed, and said he "underst[ood] and wishe[d] to proceed" with the procedure. Later that day, Barrett was taken to an operating room where Swan performed a "[r]ight knee arthrotomy" with "[i]ncision, debridement and lavage of septic knee" in order to open up, clean, and flush out the infection.

Still hospitalized, on December 24 Barrett had a PICC (peripherally inserted central catheter) inserted for long-term intravenous administration of antibiotics. Barrett acknowledged in his deposition that by this time he had been told his knee was infected and the PICC was to be used to administer antibiotics to treat that infection.

On December 27, Barrett was discharged from the hospital to a recovery nursing facility. The medical records do not show Dr. Hershey was ever consulted or otherwise involved in Barrett's treatment during this hospital stay.

On December 31, Barrett was readmitted to the hospital at the direction of Dr. Hershey after aspiration of additional fluid from the knee at Dr. Hershey's office on December 30 indicated the presence of a new infection, possibly yeast. As Barrett put it in his deposition testimony, "I had a secondary infection."

The hospitalist, Dr. Aurelio Gonzalez, noted in the chart that Barrett was being readmitted, having earlier been admitted "for a septic joint status post arthrotomy with debridement and washout on 12/20/2015 with aspirate cultures positive for

4

Streptococcus gordonii . . . ." Dr. Gonzalez brought in consulting Dr. Mahendra Poudel from the hospital's infectious disease department to assess and assist, and Dr. Poudel also met with Barrett.

Later that day, Dr. Hershey performed a second arthroscopy and debridement of Barrett's knee in order to again try to wash out and drain any infection. Beforehand, Barrett and Dr. Hershey discussed the procedure, Barrett's "clinical progress," and the "culture results," and Barrett "wishe[d] to proceed with surgery as discussed[.]" In his deposition, Barrett acknowledged this second surgery "was to try to wash out the infection out of the knee again . . . ."

On January 1, 2016, a second PICC line was put in for additional intravenous antibiotic administration, and Barrett was finally discharged from the hospital on January 11, 2016.

On January 4, 2017, Barrett served Dr. Hershey with his notice of intent to commence an action against a health care provider pursuant to section 364. On April 4, 2017, Barrett filed a complaint containing a single cause of action for general negligence, alleging that on December 16, 2015:

"Defendant Hershey [was] a licensed healthcare provider. . . . Defendant Precision Orthopedics, A Medical Corporation, employ[ed] Defendant Hershey in the capacity of a Medical Doctor specializing in Orthopedics. Plaintiff sought and received medical treatment from Defendants for a sore right knee. Defendant Hershey proceeded to inject depo-medrol 80 and 10cc of 1% lidocaine in Plaintiff's right knee without properly preparing himself, the equipment used for injecting the depo-medrol 80 and 10cc of 1% lidocaine, and the site of the injection to prevent infection of Plaintiff's knee. As a result of Defendant Hershey's failure to protect Plaintiff from infection[,] Plaintiff's knee became seriously infected resulting in extensive surgery to Plaintiff's knee joint and surrounding tissue [and additional subsequent damages]."

5

Dr. Hershey answered and then brought a motion for summary judgment, contending Barrett's action was barred because it was filed after the applicable statute of limitations had expired. He filed a statement of undisputed material facts, and attached seven exhibits as evidence in support of his motion.

Barrett responded, indicating he did not dispute 19 of Dr. Hershey's 20 material facts, nor the exhibits Dr. Hershey had proffered in support of the motion. As to the one disputed fact, Barrett maintained the referenced exhibits did not support what Dr. Hershey had alleged. The trial court did not weigh in on this disputed fact. It appears to have had no relevance, and we have disregarded it.

In support of his opposition, Barrett included six exhibits. One was a January 16, 2019 declaration prepared for purposes of the February 1 summary judgment motion hearing. In it, Barrett stated that due to the "severity of [his] condition" he was on "substantial painkillers" and in a "tremendous amount of pain." And, as such, he "was not in a frame of mind to appreciate the circumstances leading to [his] infection until the end of [his] hospital stay, on or about January 10, 2016." Barrett declared it was only then that he "began to appreciate how Dr. Hershey's actions could have contributed to my receipt [*sic*] of the infection." Furthermore, he stated that "[a]t no time before [his] discharge did any doctor talk to [him] about how the infection could have been related to Dr. Hershey's . . . falling below the medical standard of care while delivering the injection."

The trial court granted the motion, ruling Dr. Hershey was "entitled to judgment as a matter of law, on the basis that [Barrett's] complaint is barred by the applicable statute of limitations, [section] 340.5." The "undisputed facts, and the evidence offered by [Dr. Hershey] in support of them" comprised the factual basis for the court's ruling. The court found they "establish[ed] that no later than December 31, 2015, the facts essential to [Barrett's] claim were available and obvious to [Barrett]. Those facts were sufficient to put a reasonable person on inquiry and begin the limitations

6

period, [citation]. [Barrett's section 364 notice] was served over a year later. Therefore, [Barrett's] subsequently-filed Complaint is time-barred, pursuant to [section] 340.5." Judgment was entered in favor of Dr. Hershey, and this appeal ensued.

## DISCUSSION

### *Legal Background*

Any party to an action may move for summary judgment. (§ 437c, subd. (a)(1); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 (*Aguilar*).) The moving party "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact[.]" (*Id.* at p. 850.) A defendant moving for summary judgment may satisfy this initial burden by producing evidence of a complete defense. (§ 437c, subd. (p)(2); *Aguilar, supra,* at p. 853.) "The expiration of the applicable statute of limitations is one such complete defense." (*Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 965; cf. *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 396 ["The statute of limitations operates in an action as an affirmative defense"].) Even so, summary judgment based on an affirmative defense is only proper if the moving party shows that the undisputed facts fully establish the defense. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 468.)

We review a grant of summary judgment de novo. (*Aguilar, supra*, 25 Cal.4th at p. 860.) "In practical effect, we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment." (*Lenane v. Continental Maritime of San Diego, Inc.* (1998) 61 Cal.App.4th 1073, 1079.) "'[W]e examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] We review the entire record, 'considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained.' [Citation.] Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.]" (*Regents of*

7

*University of California. v. Superior Court* (2018) 4 Cal.5th 607, 618.) Thus, all reasonable inferences must be drawn in favor of the opposing party and "summary judgment cannot be granted when the facts are susceptible of more than one reasonable inference . . . ." (*Rosas v. BASF Corp.* (2015) 236 Cal.App.4th 1378, 1392.)

"Although application of the statute of limitations is normally a question of fact, the question becomes one of law when the evidence is susceptible of only one reasonable conclusion. [Citation.]" (*Filosa v. Alagappan* (2020) 59 Cal.App.5th 772, 778 (*Filosa*); *Brewer v. Remington* (2020) 46 Cal.App.5th 14, 28 (*Brewer*) ["'whenever reasonable minds can draw only one conclusion from the evidence, the question becomes one of law.' [Citation.]"].)

*The Statute of Limitations*

The parties agree the applicable statute is section 340.5, under which the time to commence an action "for injury or death against a health care provider based upon such person's alleged professional negligence" is either three years after the date of injury, *or* one year after "the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury," whichever occurs first. (§ 340.5.)[2]

The parties also agree: January 4, 2017, is the date the action was commenced; Dr. Hershey's allegedly negligent conduct occurred on December 16, 2015, the day he injected Barrett with the corticosteroid; and section 340.5's one-year delayed discovery rule applies here.[3] The only issue before us is therefore simply stated: When

---

[2]  "The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305.) "'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (§ 340.5, subd. (2); see *Flores v. Presbyterian Intercommunity Hospital* (2016) 63 Cal.4th 75, 84.)

[3]  The fact codefendant Precision Orthopedics, M.C. is alleged to be an employer and not a health care provider, and its liability would be derivative, does not affect the statute of limitations issue. (See *Lathrop v. HealthCare Partners Medical Group* (2004) 114 Cal.App.4th 1412, 1423 [vicariously liable employer is entitled to

8

did Barrett "discover" his "injury" within the meaning of section 340.5? (Cf. *Garabet v. Superior Court* (2007) 151 Cal.App.4th 1538, 1545 ["With regard to the one-year limitation provision, the issue on appeal usually is whether the plaintiff actually suspected, or a reasonable person would have suspected, that the injury was caused by wrongdoing"].)

Dr. Hershey insists the discovery date was no later than December 24, 2015, when the first PICC was inserted for long-term intravenous administration of antibiotics, and Barrett was unequivocally aware his knee was indeed severely infected. Barrett contends the correct date is two weeks later, on January 6, 2016, when Dr. Poudel from the infectious disease department noted in Barrett's chart that "the infection seems to have started after an intra-articular injection . . . ." If Barrett is correct, his January 4, 2017 action was commenced two days before the limitations period elapsed. If he is incorrect, and the discovery date is more than two days earlier, the action is time-barred.

*Analysis*

"'[T]he term "injury," as used in section 340.5, means both a "person's physical condition *and* its 'negligent cause.'"' [Citation.] The word 'injury' for purposes of section 340.5 is a term of art that 'refer[s] to the damaging effect of the alleged wrongful act and not to the act itself.' [Citation.] The injury is not necessarily the ultimate harm suffered, but instead occurs at 'the point at which "appreciable harm" was first manifested.' [Citations.]" (*Brewer, supra,* 46 Cal.App.5th at p. 24, citing *Brown v. Bleiberg* (1982) 32 Cal.3d 426, 437, fn. 8 ["Plaintiff's 'injury' occurred at the point at which 'appreciable harm' was first manifested"].)

Here, the "injury" is the infection, and the wrongful act is the allegedly unhygienic and professionally negligent manner in which the cortisone injection was administered, thereby causing the infection. Our inquiry therefore begins with the

---

invoke against the injured plaintiff whatever substantive defenses to liability are available to its health care provider employee].) Our analysis therefore equally applies to both respondents.

9

question of what was "'the point at which "appreciable harm" was first manifested?' [Citations.]" (*Brewer, supra,* 46 Cal.App.5th at p. 24.)

"An injury manifests when damage is 'evidenced in some significant fashion; when the damage has clearly surfaced and is noticeable.' [Citation.]" (*Filosa, supra,* 59 Cal.App.5th at. p. 779.)  Here, the infection was evidenced as early as Barrett's December 19, 2015 ER visit, when 120 cc of a "cloudy purulent" fluid was aspirated from his knee, which Barrett remarked looked to him like pus.  In his deposition, Barrett was asked, "So when you saw that pus-looking stuff going into the syringe on December 19, 2015, you thought 'I have an infection in my knee'?" and he replied, "Yes, sir."  That same day, "[preliminary] report reveal[ed] a white blood cell count of greater than 60,000," and Dr. Cole noted in the chart his impression of a "[s]eptic right knee."  Thus, by the end of December 19, the infection had "clearly surfaced," and was "noticeable" – especially to Barrett, who remarked to his daughter that he wouldn't be going home that day.  Moreover, everyone involved knew Barrett had received a cortisone injection into the same knee joint only a few days before, and that he had almost immediately thereafter began to suffer increased pain and swelling in the joint.

Therefore, "appreciable harm" had "manifested" by December 19, 2015, it was noticeable, and Barrett was fully aware of it.

The next question is when did Barrett know, or when *should* he have known, that something "wrong" had possibly caused this injury?  "[T]he one-year limitation period under section 340.5 requires the plaintiff to file a claim within one year of discovering appreciable harm and is*, or should be*, suspicious of wrongdoing as to the cause of that harm." (*Brewer, supra,* 46 Cal.App.5th at p. 28, italics added; cf. *Knowles v. Superior Court* (2004) 118 Cal.App.4th 1290, 1295 (*Knowles*) ["injury" means both a person's physical condition and its negligent cause; "a person need not *know* of the actual negligent cause of an injury; mere *suspicion* of negligence suffices to trigger the limitation period"].)

10

"[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof – when, simply put, he at least 'suspects . . . that someone has done something wrong' to him [citation], 'wrong' being used, not in any technical sense, but rather in accordance with its 'lay understanding' [citation]. [Fn.]  He has reason to suspect when he has """"notice or information of circumstances to put a reasonable person *on inquiry*""""" [citation]; he need not know the 'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place – he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does [citation]." (*Norgart v. Upjohn Co., supra,* 21 Cal.4th at pp. 397-398.)

Barrett maintains he had no reason to suspect negligence as the cause of his infection until January 6, 2016, when Dr. Poudel noted in the chart that the "infection seems to have started after [an] intra-articular injection[.]"  He argues this was allegedly the first time a medical professional "evinced at least suspicion that the injection may have been the cause," and that he was first "alerted [to] the possibility that the injection might be the cause of the continued and increased pain."  We are not persuaded.

First, the determinative factor is not other medical professionals' suspicions, it is the *plaintiff's*.  (See *Knowles, supra,* 118 Cal.App.4th at p. 1300 ["It is a plaintiff's *suspicion* of negligence, rather than an expert's *opinion*, that triggers the limitation period"].)

Second, "[u]nder the one-year limitation period of section 340.5, the plaintiff must bring suit within one year after he or she discovers, *or should have discovered*, his or her injury. . . .  If the plaintiff has notice or information of circumstances that would put a reasonable person on inquiry notice, the limitation period

11

is activated. [Citation.]  When this occurs, the 'patient is charged with "presumptive" knowledge of his negligent injury . . . .' [Citation.]"  (*Brewer, supra,* 46 Cal.App.5th at p. 24, italics added.)  Consequently, "the accrual period under section 340.5 commences when there has been, from an objective standard, a manifestation of appreciable harm that would put a reasonable person on inquiry notice of wrongdoing."  (*Id.* at p. 31.)

Barrett repeatedly emphasizes he "was never informed by any medical professional that the infection was caused by or related to the injection prior to his discharge from care on or about January 10, 2016."  And "[a]t no time prior to his discharge did any medical professional tell Mr. Barrett that the infection was related to or originated at the injection site."  But he provides no authority or argument for why this fact conclusively affects the running of the statute.  Although such disclosure by a "medical professional" would have been *sufficient* to trigger the running of the statute, it does not follow that it was *necessary*, and the cases Barrett cites do not hold otherwise.

Barrett also argues "[o]nly on January 6, 2016, did [D]octor Poudel note that 'the infection seems to have started after an intra-articular injection'. . . ."  This is factually inaccurate.  The hospital records from Dr. Poudel's *initial* consultation with Barrett on *December 31, 2015* show Dr. Poudel noted in the chart that Barrett had been "diagnosed with right septic knee due to Streptococcus gordonii.  Onset of symptoms on his last [hospital] admission was 24 hours after intra-articular steroid injection."  And most importantly, it was in this same December 31 chart entry, not the January 6 entry, where Dr. Poudel first opined, "[Barrett's] initial infection *seems to have started after intra-articular injection . . . .*"  (Italics added.)

Yet this exact language is what Barrett now contends was the decisive event that started the limitations clock running.  Thus, he concludes his brief by arguing: "In asking for a triggering event, the [t]rial [j]udge said[,] 'I mean is there any conversation?  Is there anything in the medical records . . . Did anybody say anything to [Barrett]?'  There is in the medical records Dr. Poudel's statement that that [*sic*] 'the

12

infection seems to have started after an intra-articular injection' may have been the triggering event. [¶] . . . No medical professional before January 6, 2016 alerted [Barrett] of the possibility that the injection might be the cause of the continued and increased pain. Only on January 6, Dr. Poudel evinced at least a suspicion that the injection may have been the cause."

But, as we have seen, this same chart entry was actually first made on December 31, not January 6. Hoisted by his own petard, it would appear even Barrett is hard-pressed to deny that December 31, 2015, is the determinative date, and perforce a January 4, 2017 action would be untimely.

Barrett also points out that as late as January 6, Dr. Poudel was still "dealing with two separate infections, yeast infection and the septic arthritis," and that it was unusual "'to have ongoing septic arthritis after [incision and drainage] with a different organism especially fungus.' []" Again, however, it is not Dr. Poudel's inability to explain the full ramifications of Barrett's injury – a worsening multi-faceted infection – that is relevant. It was the injection-caused infection that comprised the already manifested injury, not its etiology or subsequent complications and secondary effects. (Cf. *Knowles, supra,* 118 Cal.App.4th at p. 1298 ["[C]ourts have rejected the argument that the limitations period does not begin to run until a plaintiff learns the specific causal mechanism by which he or she has been injured"].) This is particularly true when, as here, the complaint does not allege causes of action against Dr. Poudel or the hospital and its staff.

Barrett was fully aware of the unsterile circumstances surrounding his steroid injection and its almost immediate aftermath, including the worsening pain and swelling. When he finally went to the emergency room two days after the injection, he was in such severe pain he could barely walk. He watched as the knee was aspirated, and he saw what looked to him like pus and knew his knee was infected. He knew his condition was severe enough to be hospitalized and knew he was not going to be merely

13

sent home with an antibiotic prescription. He soon became aware he was suffering a serious infection in the same knee joint that had been injected just days before, and that he was being treated in part by a consulting member of the hospital's infectious disease department. He was released but readmitted when the infection worsened and became more complicated. He had two surgical procedures, both intended to deal with an increasingly serious infection that could reasonably, if not inexorably, be traced back to the nonsterile injection he received in Dr. Hershey's office mere days before. And all these events and circumstances occurred *on or before* December 31, 2015.[4]

This conclusion is not merely fallacious post hoc ergo propter hoc reasoning. The *only* objectively reasonable suspicion was that Barrett's injury was caused by the unsterile administration of the cortisone injection. Unlike the anesthetized patient who is unaware of her injury until long afterward, or the patient whose x-rays were incorrectly read by the radiologist or lab tests incorrectly interpreted by the pathologist, here Barrett was an eyewitness to the negligent actions and their almost immediate effects. He was a competent adult who had received cortisone injections in the past and knew what to expect and what would be unusual. (Compare *Filosa, supra,* 59 Cal.App.5th at p. 773 [patient who received several false reassurances from physician about his symptoms was not on inquiry notice of his illness and injury].)

Even assuming Barrett did not subjectively connect all the proverbial dots until January 6, 2016, or as he put it in his declaration, he did not "beg[i]n to appreciate"

---

[4] Barrett cites *Brown v. Bleiberg, supra*, 32 Cal.3d 426 to support an argument he was entitled to rely upon Dr. Hershey's skill and judgment while under his care and therefore had a to exercise only a "diminished" degree of diligence in ferreting out the negligent causes of his infection. However, no ferreting was required in this case; Barrett was fully aware of all the relevant facts and knew or should have known of their factual significance. *Brown v. Bleiberg* is also factually distinguishable, because it involved a situation where the cause of the plaintiff's injury was the improper surgical removal of portions of the bones of her feet while she was anesthetized for what was supposed to be corn surgery. Not only was the plaintiff unaware and not told what the surgeon had done, but she was lied to about it. (*Id.* at pp. 430-431.) More importantly, the plaintiff continued to believe the doctor's explanations for her injuries and the statute was tolled during the time that the defendant continued to make reassuring statements to the plaintiff. Here, there is no evidence anyone, let alone Dr. Hershey, told Barrett the infection had nothing to do with the injection.

the significance of Hershey's unhygienic conduct because he was not in the right "frame of mind," it is beyond any reasonable dispute that he *should* have.

The law provides alternate tests for triggering the limitations period: (1) a *subjective* test requiring actual suspicion by the plaintiff that the injury was caused by wrongdoing; or (2) an *objective* test requiring a showing that a reasonable person would have suspected the injury was caused by wrongdoing. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.) Here, the objective test applies. "For purposes of the one-year period, discovery of the injury means the plaintiff has discovered 'both his or her injury and its negligent cause.' [Citation.] . . . If the plaintiff has notice or information of circumstances that would *put a reasonable person on inquiry notice*, the limitation period is activated.' [Citation.]" (*Filosa, supra,* 59 Cal.App.5th at p. 779, italics added.) This is such a case.

## DISPOSITION

Even drawing all reasonable inferences in Barrett's favor, we find the statute of limitations in this matter began to run no later than December 31, 2015. The action commenced on January 4, 2017 was therefore time-barred by section 340.5. The

15

judgment is affirmed.  Respondents shall recover their costs.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                        BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


MARKS, J.*


*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.